Mohammed MOHSIN, Petitioner,

v.

Robert EBERT, Respondent.

No. 06 CV 3240 (RJD)(JO).

United States District Court,
E.D. New York.

June 15, 2009.

Robert J. Boyle, Robert J. Boyle, Esq., New York, NY, for Petitioner.

New York State Attorney Generals Office—Generic, Emil Stanley Bricker, Queens County District Attorneys Office—Generic, Kew Gardens, NY, for Respondent.

## MEMORANDUM & ORDER

DEARIE, Chief Judge.

Mohammed Mohsin petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court referred the petition to Magistrate Judge James Orenstein for a Report and Recommendation in accordance with 28 U.S.C. § 636(b).

In his comprehensive, fifty-five page Report and Recommendation dated March 17, 2009, Magistrate Orenstein recommends that petitioner's application be denied. By Order dated March 27, 2009, the Court granted petitioner's motion for an extension of time to file his objections to the Report and Recommendation, which he timely filed in a statement dated May 4, 2009. The Objections expressly "address[ ]only certain aspects of the Report" but also incorporate in their entirety each of the arguments advanced in the 89–page brief submitted in support of the petition.

Accordingly, the Court has reviewed the matter *de novo*. Having studied the parties' submissions along with the trial transcript and the lengthy post-trial state court record, the Court now adopts the Report and Recommendation in its entirety and without qualification. A copy of the Report and Recommendation is annexed hereto as an addendum to this Memorandum and Order.

## DISCUSSION

The thoroughness of Judge Orenstein's Report and Recommendation obviates the need to restate the factual background, or to engage in the needless formality of summarizing each of petitioner's six claims along with each capsule of Judge Orenstein's analysis in order to lodge the Court's piecemeal agreement. Still, because petitioner persists, in his Objections to the Report, in asserting that he is innocent of the crimes of which he was convicted, the Court explains here the features of the record and the Report that weigh most heavily and convincingly *against* the granting of habeas relief.

In his Objections, as in each of the state court proceedings occurring *after* his trial,

petitioner relies principally on the victim's post-trial recantation of her trial testimony, along with several other witness statements and expert opinions also obtained *after* the trial. So equipped, petitioner seeks to cast himself as the victim of a criminal justice system stubbornly deaf to his plea of innocence. He writes:

It was not until March 1996 that Ms. Sufian implication petitioner in the September 13, 1995 fire. At trial she was the only witness linking him to it. Almost immediately after the trial she recanted her trial testimony. At petitioner's sentencing, she begged the court to release him. Moreover, for the next 12 years through two motions to vacate, Ms. Sufian has steadfastly maintained that petitioner had nothing to do with the fire and that she herself intentionally set it. Her assertions have been corroborated by others and by scientific evidence presented to the state courts in the motions to vacate. *Yet to date no court has even ordered an evidentiary hearing to afford petitioner a reasonable opportunity to prove both his innocence and Ms. Sufian's perjury.* (Obj. 4, emphasis added).

There is a fatal shortcoming, however, in petitioner's breathless plea. He *was* afforded precisely the opportunity he now claims had been withheld from him. That opportunity, of course, came in the form of his criminal trial, and the record shows that petitioner made abundant use of that opportunity by having vigorously challenged Sufian on several fronts. It is, in the end, immaterial that the jury did not learn of Sufian's recantations: contrary to petitioner's characterization of them, Sufian's recantations (along with the body of other post-trial statements purporting to corroborate them) are not of the "smoking gun" or "newly discovered" variety. Rather, the entire post-trial narrative reads as a more elaborate, more polished, and more strategically drafted version of the principal factual contentions and legal theories asserted at trial.

For example, although petitioner did not testify, his "version" of events was put before the jury through the testimony of Fire Marshal Roger Eckert and New York City Police Detective Miriam Piretti. Both testified that, shortly after the fire, petitioner stated that he had just left the apartment for work when, realizing he had forgotten his beeper, he returned, heard his girlfriend crying for help, summoned the landlord, and then broke down the apartment door and rescued her. T. 740, 853.

Similarly, cross-examination of Sufian exposed the same principal factual grounds for not crediting her testimony that now fuel petitioner's several perjury-based habeas claims. Among other things, the jury learned that Sufian had not implicated petitioner until six months after the fire and that she had initially told investigators that the fire resulted from an accident in the kitchen. The jury also learned of the turbulent amorous relationship between petitioner and Sufian, and heard both sides seek to explain actions of Sufian and petitioner as the result of that turbulence. Thus, the jury learned that Sufian had previously faked a suicide attempt in order to secure petitioner's sympathy and that she blamed the fire on him only after he rebuffed her when she tried to visit him at work. Indeed, the jury heard counsel expressly argue petitioner's "version" of what really happened, namely, that Sufian, suffering from what counsel described as a kind of "fatal attraction" to petitioner, set herself on fire because she could not accept petitioner's decision to leave her. Finally, the jury learned that Sufian had lied in a variety of other contexts, including that she sued the landlord for negligence in order to support her initial false claim that an explosion on the kitchen stove caused the fire, and that she misrepresen-

ted her age and marital status in a Family Court petition for support from petitioner.

The fact that the jury nonetheless elected to credit Sufian's account of how petitioner set her on fire—riveting even on the cold transcript—is all but dispositive for habeas purposes. As Judge Orenstein's summary of habeas principles on this point succinctly and accurately explains, petitioner's burden is heavy: to obtain relief here, he must show that the jury's decision to credit Sufian is "an unreasonable determination of the facts in light of the evidence presented" within the meaning of 28 U.S.C. § 2254(d), and must likewise overcome the statutory presumption of correctness that attaches to state court factual findings by presenting "clear and convincing evidence" to the contrary within the meaning of 28 U.S.C. § 2254(e)(1).[1] *See* Report at 302. Petitioner could not possibly meet this burden by relying solely on the contents of his trial record: the jury that witnessed Sufian's demeanor and was offered many reasons not to believe her nonetheless chose to credit her compelling account. That finding is virtually inviolate.

Petitioner also fails to rebut the presumption of factual correctness, or to establish the unreasonableness of the jury's verdict and ensuing appellate affirmance, by relying on the post-trial recantations. First, as already stated, the recantations do not offer substantively new "evidence" but merely attempt to trigger a post-hoc, re-assessment of Sufian's credibility. Second, the state court that presided over petitioner's trial has reviewed those recantations and refused to credit them. *See* 330 Motion, Memorandum Decision at 2, 3 (recantation "inherently unreliable"); First 440 Motion, Memorandum Decision at 11 (recantation inherently suspect; Sufian's various accounts internally inconsistent). Of course petitioner's *second* 440 motion then sought to challenge *those* credibility findings by submitting still later-generated witness statements and expert affidavits purporting to corroborate the recantations. But nothing in those papers reveals *those* new statements to have been unavailable to petitioner at the time of his trial or, for that matter, at the time he made his 330 Motion or his First 440 Motion. More fundamentally, the succession of motions reveals petitioner's boundless capacity to generate, after each defeat, a next and more strategically crafted round of documents.[2] It is for this very reason, as Judge Orenstein soundly concluded, that recantations such as Sufian's have long been viewed with the "utmost suspicion."

In short, particularly because of petitioner's zealous claim of innocence, it bears

1. We note our agreement with Judge Orenstein's observation that the Second Circuit has not determined whether a habeas petitioner seeking relief from a state court decision that rested on a finding of fact must satisfy both of these statutory provisions or only one of them, and further agree that in any event petitioner cannot show make either showing. *See* Report at 302 (delineating these principles but in the context of a later round of factual findings).

2. Indeed, one such document, by being so obviously tailored to a previous aspect of the case, has the effect of signaling the strategic rather than authentic nature of the post-trial record. At trial, two witnesses testified that petitioner appeared to be neat and clean at the time of the fire and rescue, and the state argued that the lack of any soot on his clothing undermined petitioner's claim that he rescued Sufian, given the soot-filled condition of the apartment and Sufian herself. Initially, petitioner challenged the thoroughness of the two witnesses' opportunity to observe appearance, and refuted the state's insistence that he should have had soot on him if he had really rescued Sufian as he claimed; eventually, however, in his second 440 motion, petitioner decided to submit an affidavit from someone who claimed that petitioner did in fact have a sooty appearance shortly after the fire and rescue.

remarking that the denial of habeas relief here rests not on unduly formalistic adherence to rules and presumptions but, to the contrary, illustrates a paradigmatic alignment among habeas burdens of proof, the federalism values they promote, and the underlying factual reality of the case. New York courts have three times elected to credit Sufian in the face of colorable claims to the contrary; more precisely, they have twice expressly chosen not to believe her post-trial change of heart. Such a multi-tiered credibility—based factual finding is, for all intents and purposes, unalterable on habeas. *See* 28 U.S.C. § 2254(d)(2), (e)(1). At the same time, the Court's close review of the record convinces it that even if there were authority to do so, there is no compelling reason to disturb those findings. To reiterate, it is immaterial that the jury did not learn of Sufian's recantations because the entire post-conviction theory constructed atop those recantations is the same theory that was presented to the jury, and because the factual matters bearing on Sufian's motives for implicating or not implicating petitioner (the high and low points of their relationship) were also presented to the jury. In short, nothing has been overlooked and no injustice has occurred. Habeas exists to provide relief when a conviction has been obtained in violation of the Constitution, not to provide a forum for retrying cases.[3]

### CONCLUSION

The Report and Recommendation of Magistrate Orenstein is hereby adopted in its entirety and without qualification, petitioner's application for a writ of habeas corpus is denied, and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2254(c)(2), a certificate of appealability shall not issue. In addition, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. The Clerk of the Court is directed to close this case.

SO ORDERED.

### REPORT AND RECOMMENDATION

JAMES ORENSTEIN, United States Magistrate Judge:

Petitioner Mohammed Mohsin ("Mohsin") seeks a writ of habeas corpus. He is currently in the custody of New York State as a result of his conviction of attempted murder in the second degree and assault in the first degree. The charges arose from an allegation that Mohsin doused the victim of the offenses with gasoline in the apartment that they sometimes shared, set her on fire, and locked the apartment door behind him as he left her to burn. In the decade since his indictment, Mohsin has engaged in extensive litigation—much of it relying on the victim's own many differing accounts of the events at issue—predicated on the theory that the victim was injured in a fire she herself started rather than by his own deliberate crime. In the instant petition, Mohsin argues that the evidence at his

---

**3.** Similar analysis disposes of petitioner's assertions concerning the chain lock, a feature of the case that, in his Objections, he continues to maintain is dispositive proof of his innocence. Simply put, the identical argument and supporting evidence (including the photo of a broken lock on the pile of debris) were fully presented to the jury, which chose to reject it, and petitioner has not shown that decision to be unreasonable.

Likewise, petitioner's ineffective assistance of counsel claims (both trial and appellate) were fully litigated in state court, with the state court having elected to credit the statements submitted in opposition by the lawyers whose conduct was at issue. Such fully litigated ineffectiveness claims are relatively rare in contemporary habeas jurisprudence, and such credibility-based state court decisions are entitled to substantial deference.

trial was insufficient to support a conviction, that the trial court improperly admitted certain expert evidence, that the prosecutor deprived him of a fair trial by knowingly introducing perjured testimony and by suppressing evidence that would ostensibly have revealed that perjury and exonerated him, and that he was deprived of the effective assistance of counsel both at trial and on direct appeal of his conviction. The Honorable Raymond J. Dearie, Chief United States District Judge, has referred the matter to me for report and recommendation. I now make my report and, for the reasons stated below, respectfully recommend that the court deny Mohsin's petition.

## I. Background

### A. Mohsin's Relationship With The Victim

Mohsin was involved in a relationship with Syeida Sufian ("Sufian")[1] that began in 1991, when Sufian was sixteen years old. The two were married in a religious ceremony on February 14, 1992—a fact that they planned to keep secret until Sufian's eighteenth birthday—but never entered into a civil marriage. While Sufian was still a minor, Mohsin rented a small apartment in the basement of the home of Mohindranauth Seerattan ("Seerattan"). Of relevance to the events at issue in this case is the fact that the apartment included a kitchen with functioning stove, as well as the fact that the apartment door was equipped with both a chain lock (that could be secured only from the inside) and a key-operated lock. Mohsin initially lived in the apartment with Sufian, but after a time ceased doing so and instead visited Sufian there on occasion. DE 8, Transcript of Jury Trial ("TT") 516–22, 529, 729, 957, 991–95, 997, 1000–01, 1037, 1045–47.[2]

[1] Although the trial transcript renders this individual's name as "Syeda Suffain," she uses "Syeida Sufian" in her own affidavits. I will use the latter spelling in this Report and Recommendation.

[2] Docket Entry 8 contains all of the documents from the state court proceedings that the respondent has submitted. In addition to the trial transcript, it includes the papers each party submitted in connection with Mohsin's several requests for post-trial relief. Those requests included—in the order Mohsin filed them—a motion to set aside the verdict pursuant to Section 330.30 of the Criminal Procedure Law ("CPL") of the State of New York (the "330 Motion"), the direct appeal of his conviction (the "Direct Appeal"), a motion to vacate judgment pursuant to CPL Section 440.10 (the "First 440 Motion"), a motion for a writ of error *coram nobis* (the "*Coram Nobis* Motion"), and a second motion to vacate judgment pursuant to CPL Section 440.30 (the "Second 440 Motion").

In most instances, the papers submitted in connection with each motion included an affirmation of counsel, one or more memoranda of law from each party, and exhibits including witness affidavits—including, in some instances, affidavits by Mohsin's prior counsel that the prosecution submitted in opposition to Mohsin's collateral claims of ineffective assistance. In citing such papers below, I will provide the shorthand name of the relevant post-trial proceeding, the party submitting the paper ("Mohsin" or "State") if not apparent from context, the type of document ("Memo." for Mohsin's initial memorandum of law, "Opp." for the State's opposing memorandum of law, and "Reply" for Mohsin's reply memorandum of law; as well as "Counsel Aff." for a non-evidentiary affirmation by the party's counsel submitted in conjunction with or in lieu of a memorandum of law, and "[affiant's or affirmant's last name] Aff." for an evidentiary affidavit or affirmation).

Moreover, after each request for relief was denied in the court in which it was initially filed, Mohsin sought multiple levels of review, including in certain instances a motion to reargue or obtain reconsideration of the denial of relief (which I will indicate with the word "Reconsideration" regardless of the precise styling of the request), as well as a request for leave to appeal to the state's Court of Appeals ("Lv. App."). In some of the latter proceedings, the parties submitted letters in-

### B. *The Fire And The Subsequent Investigation*

On September 13, 1995, Sufian suffered extensive burns in a fire at the apartment. Soon after the fire began, Seerattan—the landlord who lived above the apartment—heard Mohsin screaming from the driveway. Seerattan told his wife to call 911 and went to investigate. When he arrived at the apartment, he saw two male strangers, neither of whom was Mohsin and whom he described as Puerto Rican, carrying Sufian from the apartment. He assisted them, blackening his clothes in the process, while his son extinguished the fire. TT 502–07, 544, 561, 600.

By the time the emergency personnel arrived at Sufian's apartment, the fire had been extinguished, but smoke continued to spill from the entrance to the apartment, and the apartment itself was black with soot. TT 474; 637–38. The apartment was filled with dark, sooty smoke, and rugs and debris continued to smolder on the ground near the entrance. TT 639, 643. The fire had occurred immediately behind the front door, next to the kitchen cabinets; contrary to Sufian's subsequent statements to investigators that the fire had begun while she was cooking, the stove sustained no damage. TT 639, 641–42; 647. A yellow container three-quarters full with what appeared to be gasoline was found on a dresser on the left-hand side of the apartment's entrance, and a strong smell of gasoline was present in the air. TT 640; 670; 734. Investigators later confirmed the presence of gasoline in both the yellow container and a sample of the fire debris removed from inside the front door of the apartment. TT 820. The fire was deemed to be of a suspicious nature, and a fire marshal was summoned. TT 670. The fire marshal determined that the smoke damage was consistent with a fire involving a flammable liquid. TT 728–29.

By the time the fire marshal arrived, Sufian was outside the apartment, seated at a picnic table. She had suffered burns

---

stead of memoranda of law, but for ease of reference I will use the same citation terms listed above for memoranda. Thus, for example, I will cite the letter that the prosecution submitted in opposition to Mohsin's request that the Court of Appeals reconsider its earlier denial of Mohsin's request for leave to appeal the lower court's denial of Mohsin's petition for a writ of error *coram nobis* as "*Coram Nobis* Motion, Lv. App., Reconsideration Opp."

The respondent's counsel filed the state court record as an unintelligible jumble of unrelated papers velo-bound together in no discernible order. When my law clerk requested counsel's assistance in organizing the record so that I could better assess the instant petition, counsel refused to provide such assistance. That refusal was particularly counter-productive in light of the respondent's many procedural arguments for denying the petition. Those arguments take up almost 40 pages of the respondent's brief, and an assessment of their merit requires a searching review of the state court proceedings. *See* DE 10 (Respondent's Affidavit and Memorandum of Law in Opposition to Petition) ("Resp. Br.") at 46–84.

As a result, my law clerk spent considerable time and effort untangling the mess that counsel had created. Thanks to her yeoman efforts in that regard, the court will be better able to review this report and assess the respondent's procedural arguments. It will find the papers submitted in connection with each post-trial proceeding arranged in chronological order in a folder dedicated exclusively to that proceeding, with the folders arranged in the chronological order in which the proceedings were initiated within the box containing the state court record (another folder contains transcripts of miscellaneous proceedings before the trial court). I caution the law office representing the respondent in these proceedings that in future cases, a similar unwillingness to produce the state court record in intelligible form may result in a recommendation that the court deem its procedural objections to a habeas petition to be waived.

covering some 35 percent of her body, mostly on her right side. An ambulance later transported her to the Cornell Medical Center, where she remained for five weeks. TT 471–72, 638, 669, 1186, 1203–04, 1214.

While Sufian was still outside the apartment, Mohsin arrived in the backyard. TT 474–75. According to a police officer, he appeared "normal" when he arrived at the scene, and had no soot or dirt on his clothing. TT 479. His appearance when he later arrived at the hospital was similarly unremarkable, although he had burns on his fingers, as well as singed hair and eyebrows. TT 1119–20.

Fire Marshal Eugene Dyckman ("Dyckman") interviewed both Sufian and Mohsin at the hospital. Although her injuries and her limited command of English made their communication difficult, Sufian told Dyckman that Mohsin had not caused her injuries. She stated that she was injured while making coffee on the stove, and she denied any knowledge of a container of gasoline found in the apartment. TT 698–99, 704. Sufian similarly told Fire Marshal Roger Eckert ("Eckert") that the fire was an accident. TT 743. Eckert ultimately closed his investigation without determining a definitive cause of the fire. TT 777.

Dyckman transported Mohsin from the hospital to the 103rd Precinct, where he was interviewed by Eckert and Lt. Miriam Piretti ("Piretti"). TT 700, 739–40. Mohsin told Eckert and Piretti that on the morning of the fire, he left for work but realized he forgot his beeper and returned to the apartment to retrieve it. He said that he heard Sufian screaming and attempted to enter the apartment but found it locked. Mohsin went on to say that he then kicked in the door, dislodging the chain lock from its connection in the process, and pulled Sufian from the apartment. TT 740, 853.

Piretti later made several attempts to contact Sufian through Mohsin. On October 24, 1995, Mohsin agreed that he would have Sufian contact her. TT 866. On November 15, Piretti again spoke to Mohsin, who said he did not know where Sufian was or where she could be contacted. When Piretti pressed Mohsin for further information, he said that he would be taking Sufian to the doctor soon and would have her telephone Piretti. On November 17, Sufian contacted Piretti and they arranged to meet at the precinct. Mohsin escorted Sufian to the precinct, and was reluctant to allow Sufian to speak to Piretti alone, but ultimately acceded to Piretti's insistence on a private interview. Apparently, Sufian adhered to her earlier statements; Piretti informed her that she would close the case, but gave Sufian her card and told her to call if she needed anything.[3] Over three months later, on February 29, 1996, Sufian arrived at the 103rd precinct looking for Piretti. Mohsin was arrested soon after. TT 868–75.

### C. *The Trial*

Mohsin was charged with one count of attempted murder in the second degree and two counts of assault in the first degree. Two attorneys represented Mohsin at his trial in May 1999 (as well as in pretrial proceedings and all other proceedings through sentencing): Stephen J. Singer ("Singer") and Kenneth J. Schreiber ("Schreiber"). The trial ended on May 13, 1999, when the jury found Mohsin guilty on all three counts. TT 1505.

In presenting its case, the prosecution relied heavily on circumstantial evidence

---

**3.** Mohsin's attorneys objected to the admission of this testimony. Their objections formed the basis for one of several motions for a mistrial, the withdrawal of which forms part of Mohsin's claim in this court that he was denied the effective assistance of counsel.

about the origin of the fire, some of which is described above. It also presented expert testimony relevant to the issues now before the court. One expert was Dr. Roger Yurt ("Yurt"), the director of the Cornell Medical Center's burn unit (the largest burn unit in the country, *see* TT 1187), who opined on the causation of Sufian's burn injuries. In testimony that Mohsin now claims should not have been admitted, Yurt opined that the nature and location of Sufian's extensive burns was consistent with the proposition that Mohsin had attacked her with a flammable liquid and set her on fire and inconsistent with the proposition that the fire was accidental. In particular, he explained how Sufian's injuries—primarily on one side of her body; more severe in the upper body and on one arm apparently raised in self-defense; and more concentrated at the neck area, where the collar of her dress would have absorbed more of the flammable liquid that Mohsin allegedly poured on her—were more consistent with an intentional attack using accelerant than with the description of the events Sufian initially provided to investigators. *See* TT 1211–13, 1218–19, 1246.

Another expert, former fire marshal Eugene West ("West") likewise bolstered the prosecution's theory of the case in several respects. He testified that a person who has been in close proximity to the ignition of some form of vapor would show effects consistent with Mohsin's condition in the aftermath of the fire: singed hair and eyebrows but no additional damage to the surrounding tissue and clothing. *See* TT 1270 (West's testimony); TT 1119–20 (eyewitness description of Mohsin's condition). West also testified that a gasoline fire in a small space similar to Sufian's apartment would cause a great deal of soot and heavy black smoke, which would have rushed out the door in a "flue effect" as soon as the door was opened from the outside, covering the person opening the door with soot.

TT 1272–74. The latter testimony, combined with observations that Mohsin had no soot on his clothes when emergency personnel arrived at the scene of the fire, TT 479, cast doubt on Mohsin's assertion that he had rescued Sufian from the burning apartment. Finally, West also testified that Sufian's burns were consistent with a pour-type pattern caused by gasoline that, once ignited, ran down her arms as it burned and that they were inconsistent with a fire that had started at her feet. TT 1276–78.

In addition to its circumstantial evidence, the prosecution also introduced direct proof of Mohsin's guilt in the form of Sufian's first-hand account of the events at issue. In contrast to her initial statements to investigators, Sufian's trial testimony did not tend to exonerate Mohsin; to the contrary, she provided a chilling first-hand account of how he set her on fire and left her in the burning apartment. Specifically, she testified that on the day of the fire, she and Mohsin were together in the apartment and continuing an argument that had begun the previous evening concerning their relationship and whether they would ever enter into a civil marriage. Sufian testified that as the argument wore on, Mohsin left the kitchen area, where Sufian was washing some utensils, and went into the bathroom. Through an interpreter, Sufian told the jury what happened next:

> [T]hen he came in front of me and then threw ... petrol on me. I had just turned slightly and had raised my hands and said: What are you doing? And at that time he said: See how I'm going to kill you. And soon after he put a light[ed] match on me and he went out of the door and locked the door. And at that time there was so much fire in the room. I started shouting and I was shouting for help. And there was so much fire around me. (Brief pause.)

And at that time I had a feeling I'm going to die now.

TT 956–57.

Sufian was unable to recall what happened next, or how she escaped the apartment, other than that an unidentified person carried her. TT 964–65. She also identified the yellow container that the prosecution had introduced in evidence as the object Mohsin had been holding when he splashed her with gasoline. She testified that she had seen it in the bathroom apartment early in the morning of the day of the fire; she had tried to question Mohsin about it, but he dismissed her questions. TT 969.

In describing the immediate aftermath of the fire, Sufian testified that, once Mohsin returned to the scene, he told her to let him do the talking, not to tell the police that he had caused her injuries, and that if she complied, he would "do everything [he had] always told [her]." TT 966. Mohsin instructed Sufian to tell anyone who inquired that the fire was an accident and that the oven had caught fire while she was cooking—a direction with which she initially complied. TT 968. Likewise, while she was recuperating in the hospital, Mohsin repeated his promises to enter into a legal marriage with her and to rent a new apartment in which they would live together as a couple. During Sufian's hospital stay, her visitors included Mohsin, his friends, and his family. TT 974–75.

Sufian further testified that during the investigation of the fire, Mohsin told her that the police were seeking to question and arrest her. He told her to contact Detective Piretti, but to do so from a public telephone so that the police could not discover her address. When Mohsin finally took Sufian to see Piretti, he again instructed Sufian on what to say about the cause of the fire. Mohsin told Sufian that if she did not do as he said, she would be arrested or deported and would not re-

ceive proper medical care. Mohsin instructed Sufian to tell Piretti that her landlord had given her paint to paint the apartment and that, in trying to remove paint from her hands with turpentine, some of the turpentine had remained on her hands, and that the turpentine caught fire when she turned on the oven. Sufian obeyed and gave Piretti the story that Mohsin had concocted. TT 978–81.

In describing the period following her release from the hospital, Sufian testified that Mohsin first took her to stay with his aunt for a week, then moved her to a "very dirty" room in an apartment he had rented. TT 977. After about a month, Mohsin stopped visiting Sufian, and she came to believe he had left New York for Atlanta. In February 1996, Mohsin twice called Sufian and asked her to come to his office; on each occasion, when Sufian appeared at his office she was confronted by the police, who informed Sufian that a complaint had been made about her and asked her to leave. Soon after these incidents, Sufian returned to the 103rd Precinct and told Piretti "the truth" about the fire, implicating Mohsin. TT 984–90.

### D. *Post–Trial State Court Proceedings*

Prior to sentencing, while still represented by Singer, Mohsin filed the 330 Motion on June 16, 1999. In it, he claimed that Sufian had recanted her testimony in a statement to a cleric named Moulana Beg ("Beg"). *See* 330 Motion, Counsel Aff. at 2; 330 Motion, Beg Aff. ¶ 2. The court denied the motion in a memorandum decision dated August 24, 1999. Two days later, on August 26, 1999, the court sentenced Mohsin to indeterminate prison terms of, respectively, six-to-eighteen years on the attempted murder charge and three-to-nine years on each assault charge, with all three terms to run concurrently. DE 8, Transcript of Sentence 24.

Mohsin filed a direct appeal of his conviction and sought relief on four grounds. His counsel on direct appeal was Richard E. Mischel ("Mischel"). In addition to arguing that the evidence was legally insufficient to establish his guilt, Mohsin asserted that the trial court committed error by admitting certain expert testimony, abused its discretion in denying the 330 Motion without a hearing, and imposed an excessive sentence. *See* Petition at 3; Direct Appeal, Memo. at 22. The appellate court rejected all four claims. *People v. Mohsin,* 302 A.D.2d 609, 755 N.Y.S.2d 625, 625 (2003). Specifically, it held that Mohsin had not preserved his insufficiency claim for appellate review, but the evidence was "[i]n any event" legally sufficient to establish his guilt beyond a reasonable doubt. *Id.* at 625. The appellate court rejected all of Mohsin's other claims on the merits. *Id.* at 625–26. The New York Court of Appeals denied Mohsin leave to appeal on July 17, 2003. *People v. Mohsin,* 100 N.Y.2d 585, 764 N.Y.S.2d 395, 796 N.E.2d 487 (2003) (unpublished table decision).

In addition to seeking relief on direct appeal of his conviction, Mohsin made three attempts to secure collateral review in the state courts: the First 440 Motion, for which attorney Singer again represented him; the *Coram Nobis* Motion, which Mohsin filed without counsel following the conclusion of his direct appeal; and then the Second 440 Motion, for which he engaged attorney Robert E. Boyle ("Boyle").

In his First 440 Motion, filed on March 9, 2000, Mohsin raised several claims. First, he asserted that new sworn statements by Sufian and two of her acquaintances would have convinced the jury to render a verdict in his favor. First 440 Motion, Counsel Aff. at 5, 8–9 & Exs. B–D. He further argued that new evidence consisting of tape-recorded statements by Seerattan and his son undermined the prosecution's theory by showing that the

chain lock on the apartment's door was in working condition at the time of the fire (which Mohsin contends would have supported his version of the events in dispute), and that the prosecutor improperly sponsored the admission of false testimony about the lock. First 440 Motion, Counsel Aff. at 9–10, 13. Finally, Mohsin argued that the prosecution had failed to turn over to the defense certain photographs that Piretti took during her investigation, in violation of its disclosure obligation under New York's "*Rosario* " rule. *Id.* at 14; *see* N.Y.Crim. Pro. Law § 240.45(a) (requiring prosecution to disclose to the defense prior statements by persons whom the prosecutor plans to call as witnesses at trial); *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961). The court denied the motion, and then, after hearing further argument, denied Mohsin's application for reconsideration. The appellate court denied Mohsin leave to appeal.

On September 1, 2004, several months after his conviction was affirmed on direct appeal, Mohsin, representing himself, filed the *Coram Nobis* Motion. He argued that he had been denied the effective assistance of appellate counsel because Mischel had failed to raise a claim of prosecutorial misconduct as part of the direct appeal. *Coram Nobis* Motion, Memo. at 31–34. The court denied the motion on March 21, 2005. *People v. Mohsin,* 16 A.D.3d 599, 790 N.Y.S.2d 881 (2005). The Court of Appeals denied Mohsin's request for leave to appeal on August 8, 2005. *People v. Mohsin,* 5 N.Y.3d 808, 803 N.Y.S.2d 37, 836 N.E.2d 1160 (2005) (unpublished table decision). Mohsin moved for reconsideration of that denial, and the Court of Appeals denied that request on November 21, 2005. *People v. Mohsin,* 5 N.Y.3d 884, 808 N.Y.S.2d 586, 842 N.E.2d 484 (2005) (unpublished table decision).

Mohsin filed his Second 440 Motion on September 12, 2005 (during the pendency of his request to reconsider the denial of leave to appeal the denial of the *Coram Nobis* Motion). Represented by a new attorney who had participated in neither the trial nor the direct appeal (and who now represents Mohsin in the instant proceedings), Mohsin claimed that he was denied the effective assistance of trial counsel because his attorney had failed to call exculpatory witnesses, failed to call expert witnesses, and failed to make use of all available impeachment evidence. He further asserted that his trial counsel had provided deficient advice regarding a motion for mistrial and had denied Mohsin his right to testify as part of his defense. Second 440 Motion, Counsel Aff. ¶¶ 1–2. While the motion was pending, Mohsin's new counsel filed a supplemental document arguing that the prosecution had suppressed material exculpatory evidence by failing to disclose the recording of a 911 call. Second 440 Motion, Counsel Supp. Aff. (Mar. 27, 2006).

The court denied the motion without explicitly addressing the latter due process argument on April 6, 2006. Second 440 Motion, Memorandum Decision. Over two months later, on June 7, 2006, Mohsin sought leave to appeal the denial, and later (in response to the prosecution's argument that the request was untimely) asked that the appeal be deemed timely even though the usual filing deadline had already passed. On August 9, 2006, the appellate court denied leave to appeal without specifying whether its decision was based on the merits of the issues Mohsin sought to litigate or instead on the untimeliness of his request. Mohsin filed the instant petition on June 30, 2006—after the denial of the Second 440 Motion but before he filed his application for leave to appeal the court's denial of that motion.

II. *Discussion*

A. *Procedural Issues*

1. *Timeliness*

■ Mohsin's habeas petition was timely filed. After the Court of Appeals denied Mohsin's application for review of the affirmance of his conviction on July 17, 2003, he had 90 days to seek a writ of certiorari from the United States Supreme Court. He did not do so, and his conviction accordingly became final on October 15, 2003. 28 U.S.C. § 2244(d)(1)(A); *see Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir.2001). Although a habeas petition must generally be filed within one year of a final conviction, post-conviction collateral proceedings toll the statute of limitations. 28 U.S.C. 2244(d)(2). Mohsin filed his *Coram Nobis* Motion on September 1, 2004, tolling the statute of limitations 321 days after his conviction became final. The court denied the *Coram Nobis* Motion on March 21, 2005. Under earlier case law, that event would have ended the tolling period for purposes of the one-year statute of limitations, on the ground that the denial of such a motion is not appealable. *See, e.g., Hizbullahankhamon v. Walker*, 255 F.3d 65, 70–71 (2d Cir.2001) (citing cases). However, a change in New York law permitted Mohsin to seek leave to appeal the denial of his *Coram Nobis* Motion. *See* N.Y.Crim. Pro. Law 450.90(1) (2002). As a result, the denial of the *Coram Nobis* Motion became final no earlier than August 8, 2005, when the Court of Appeals denied Mohsin leave to appeal. Mohsin filed the Second 440 Motion 35 days later, on September 12, 2005, and he filed the instant petition on June 30, 2006, while the latter motion was still pending. Accordingly, leaving aside tolling periods, Mohsin filed the instant petition no more than 356 days after his conviction became final.[4] It is therefore timely.

4. As a result, the court need not decide whether the statute of limitations was also

## 2. *Exhaustion*

As a state prisoner seeking federal habeas relief pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, Mohsin must show that he properly presented both the factual and legal premises of his claims to the state court. *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc); 28 U.S.C. § 2254(b)(1), (c). Mohsin raised all of the grounds on which he now seeks relief in either his direct appeal or in one of his post-conviction collateral motions.[5]

■■■■■ In considering whether a petitioner has satisfied the exhaustion requirement, the court must determine not only whether the petitioner raised a given claim to the state court for review, but also whether he fairly presented it as a matter of federal constitutional law. *See Duncan v. Henry,* 513 U.S. 364, 366, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). Before a federal court may grant habeas relief on an issue, the state courts must be given an opportunity to examine and, if necessary, remedy the alleged violation of the petitioner's federal rights. *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Jones v. Keane,* 329 F.3d 290, 294–95 (2d Cir.2003). A claim is not fairly presented if the reviewing state court must read beyond a petition or a brief that does not alert it to the federal claim at issue in order to find material that does so. *Baldwin,* 541 U.S. at 32, 124 S.Ct. 1347. Moreover, the petitioner must have presented to the state court essentially the same legal doctrine that he argues in his petition to the federal court. *Brooks v. McGinnis,* 104 Fed. Appx. 761, 762 (2d Cir.2004) (citing *Daye,* 696 F.2d at 191–92).

A petitioner can satisfy this latter aspect of the exhaustion requirement in a number of ways, including the citation of "pertinent federal cases employing constitutional analysis" or "state cases employing consti-

---

tolled during the pendency of Mohsin's request for reconsideration of the denial of leave to appeal the denial of the *Coram Nobis* motion. I note, however, that courts in this circuit have treated requests for reconsideration and requests to reargue as within the tolling permitted by 28 U.S.C. § 2244(d)(2). *See, e.g., Knight v. Walsh,* 524 F.Supp.2d 255, 272, 275 (W.D.N.Y.2007) (tolling continues during pendency of motion to reargue Appellate Division's denial of coram nobis motion); *Gomez v. Duncan,* 2002 WL 1424584, at *3–4 (S.D.N.Y. July 1, 2002) (motions for reconsideration of denial of C.P.L. § 440 motion and coram nobis motion both tolled statute of limitations) (citing *Artuz v. Bennett,* 531 U.S. 4, 8–9, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000)).

Likewise, the court need not determine whether Mohsin's motion for leave to appeal the denial of the Second 440 Motion was time-barred. Although the state objected to the application on that basis, its objection in that regard does not appear to have been valid. Mohsin was served with the denial of his motion on May 9, 2006, and filed his motion for leave to appeal less than one month later, on June 8, 2006. *See* Second 440 Motion, Lv. App., State's Counsel Aff. ¶ 4; Second 440 Motion, Lv. App., Mohsin's Counsel Aff. ¶¶ 3–5. At any rate, the respondent has not renewed the argument in this court that the motion for leave to appeal was untimely, and he therefore does not dispute that the limitations period continued to be tolled during the pendency of the request for leave to appeal the denial of the Second 440 Motion.

**5.** As explained in more detail below, one of Mohsin's prosecutorial misconduct claims is arguably unexhausted. Because Mohsin belatedly raised the claim in his supplementary addition to the Second 440 Motion, I consider it on the merits below.

tutional analysis in like fact situations," by asserting a claim "in terms so particular as to call to mind a specific right protected by the Constitution," or by alleging "a pattern of facts that is·well within the mainstream of constitutional litigation." *Id.* at 762–63 (citing *Daye,* 696 F.2d at 194). For the most part, Mohsin has satisfied this requirement, because most of the claims he now raises were previously presented to the state courts in a way that fairly invoked his federal rights. There is one issue that Mohsin did not raise as a matter of federal constitutional law: the admission of Yurt's expert testimony. As discussed below, I conclude that Mohsin's current claim that the admission of the testimony denied him his federal constitutional right to due process has never been fairly presented to any state court, and is therefore procedurally barred.

### 3. *Independent And Adequate State Grounds*

▮ In addition to showing that he fairly raised all of his federal claims in the state courts, a state prisoner seeking habeas relief must also show that he has been denied relief on the merits of those federal claims. This court lacks jurisdiction to review a state court decision that "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see Harris v. Reed,* 489 U.S. 255, 261–62, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Degrijze v. Artuz,* 134 Fed.Appx. 460, 461 (2d Cir.2005). An independent and adequate state ground is one that would support the judgment on its own, even if the state court's ruling on the federal claim is found to have been contrary to federal law. A common example is a state procedural rule rendering the claim forfeited under state law. *See Coleman,* 501 U.S. at 730, 111 S.Ct. 2546; *Wainwright v. Sykes,* 433 U.S. 72, 81–82, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977);

*County Court of Ulster County v. Allen,* 442 U.S. 140, 148, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

▮ In determining whether Mohsin has cleared this procedural hurdle, this court must "presume that there is no independent and adequate state ground for a state court decision"—and that it may therefore be subjected to collateral review here—"when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" *Coleman,* 501 U.S. at 735, 111 S.Ct. 2546 (quoting *Michigan v. Long,* 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). But if the opinion contains "a clear and express statement of reliance on a state procedural bar," this court may not presume that the state court decision rested on the merits of the federal claim. *Jimenez v. Walker,* 458 F.3d 130, 145 (2d Cir.2006). Of the six grounds on which Mohsin now seeks habeas relief, five meet this procedural requirement. However, as discussed below, the first ground on which Mohsin seeks relief—that the evidence at trial was not legally sufficient to sustain his conviction—does not, because the state appellate court explicitly rejected the claim on the basis of Mohsin's failure to preserve it for review. *See Mohsin,* 755 N.Y.S.2d at 625.

### 4. *The Standard of Review*

▮ With respect to each of the federal constitutional claims that Mohsin has properly presented (involving, respectively, prosecutorial misconduct and the denial of the effective assistance of counsel) the state court decisions at issue rejected Mohsin's position on the merits. As a result, this court may grant relief as to any such issue only if the relevant state court decision "was contrary to, or involved an unreasonable application of, clearly estab-

lished Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Jimenez*, 458 F.3d at 146. A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. A state court has "unreasonably applie[d]" Supreme Court precedent if, despite properly identifying the relevant Supreme Court holding, the state court unreasonably applies that rule to the facts of the case. *Id.* at 407–08, 120 S.Ct. 1495. The touchstone for the latter inquiry is objective reasonableness; habeas relief is unavailable unless the trial court's decision was "so plainly unconstitutional that it was objectively unreasonable for the Appellate Division to conclude otherwise." *Jimenez*, 458 F.3d at 147 (citing *Williams*, 529 U.S. at 409–10, 412, 120 S.Ct. 1495).[6]

## B. *Sufficiency Of The Evidence*

### 1. *The Claim Is Procedurally Barred*

 The first ground on which Mohsin seeks relief is a claim that the prosecution's evidence at his trial was not legally sufficient to sustain his conviction. When he made the same claim on direct appeal of his conviction, the court explicitly ruled that it was not preserved for review. *Mohsin*, 755 N.Y.S.2d at 625. In doing so, the court relied exclusively on state law requiring an a defendant to move for dismissal at trial in order to preserve an insufficiency claim for appellate review.

*Id.* (citing *People v. Gray*, 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 652 N.E.2d 919 (1995)). To be sure, the state court also briefly addressed the merits of Mohsin's insufficiency claim by writing that "[i]n any event, viewing the evidence in the light most favorable to the prosecution ... we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Id.* (citing *People v. Contes*, 60 N.Y.2d 620, 467 N.Y.S.2d 349, 454 N.E.2d 932 (1983)). In such circumstances, where a court discusses both state procedural and federal substantive grounds for its decision, there may exist some ambiguity as to whether the court intended to waive the state procedural ground and decide the claim on the merits. *Harris*, 489 U.S. at 261–62, 109 S.Ct. 1038.

In seeking to resolve such ambiguity, this court must "presume that there is no independent and adequate state ground for a state court decision"—and that it may therefore be subjected to federal collateral review—"when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" *Coleman*, 501 U.S. at 735, 111 S.Ct. 2546 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). But if the opinion contains "a clear and express statement of reliance on a state procedural bar," this court may not presume that the state court decision rested on the merits of the federal claim. *Jimenez*, 458 F.3d at 145.

The state court opinion in this case does contain such a clear indication: "The defendant's contention that the evidence was legally insufficient to establish his guilt ...

---

6. As explained below, I conclude that if the court disagrees with my analysis regarding procedural bars to the consideration of Mohsin's remaining claims, it should apply the same deferential standard in reviewing the merits of the evidentiary claim but should review *de novo* the merits of Mohsin's insufficiency-of-the-evidence claim.

is unpreserved for appellate review." *Mohsin,* 755 N.Y.S.2d at 625. Moreover, the court's use of the introductory clause "[i]n any event" before making its summary observation that the evidence "was legally sufficient" indicates that the point was not necessary to its ruling. Reading the decision in context, it is impossible to avoid the conclusion that the state court's rejection of Mohsin's claim "fairly appears to rest" primarily on state procedural law and not on federal law. *See Coleman,* 501 U.S. at 735, 111 S.Ct. 2546 (quoting *Long,* 463 U.S. at 1040–41, 103 S.Ct. 3469); *see Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996); *cf. Ryan v. Miller,* 303 F.3d 231, 245–46 (2d Cir.2002) (finding claim adjudicated on the merits when state court held "[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit").

■ Mohsin can overcome the procedural bar to consideration of his insufficiency claim if he can demonstrate both "cause" for his default and actual prejudice flowing from the substantive violation of federal law that he alleges; alternatively, the court can also consider the claim on its merits if the failure to do so will result in a fundamental miscarriage of justice. *Murray v. Carrier,* 477 U.S. 478, 485–86, 495, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Mohsin has presented no argument as to why either exception to the usual procedural requirements applies here, and I can see none that he may have overlooked.[7]

First, Mohsin cannot show cause for the failure to preserve the claim. While a defendant can establish such "cause" by demonstrating that his trial counsel was ineffective, *Murray,* 477 U.S. at 488–89, 106 S.Ct. 2639, the record here provides no basis on which to conclude that Mohsin's trial counsel failed to preserve an insufficiency claim due to some error—and Mohsin does not argue to the contrary despite finding fault with many other aspects of his trial counsel's performance. Nor can Mohsin show any prejudice arising from the application of normal procedural default rules to this case, as he is unable to show that his substantive claim has merit for the reasons discussed below. Second, for similar reasons, Mohsin cannot demonstrate that a fundamental miscarriage of justice will result if the court does not review the merits of his insufficiency claim. Because an explanation of the latter conclusion inevitably requires a consideration of the substance of that claim, I now proceed to a brief discussion of its merits.

### 2. *The Claim Lacks Merit*

To prevail on his claim that the evidence was insufficient to support his conviction, Mohsin would have to demonstrate that no rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found each element of the charged offenses to have been proved beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[8] There can be no

---

7. Indeed, Mohsin has presented no argument at all on this claim. Mohsin's counsel filed the petition—for the most part relying on handwritten insertions to a form typically used by prisoners who represent themselves—without any supporting memorandum of law. DE 1. After the respondent filed his opposition to the petition, DE 4, Mohsin's counsel filed a reply memorandum setting forth substantive argument as to only three of the six claims recited in the petition: the claim of ineffective assistance of trial counsel and the

two claims of prosecutorial misconduct. *See* DE 9 (Mohsin's memorandum of law in support of the instant petition) ("Habeas Memo."). Mohsin's counsel has submitted no argument in support of the insufficiency claim (Ground One of the Petition), the evidentiary claim (Ground Two), or the claim of ineffective assistance of appellate counsel (Ground Four).

8. If the court finds that Mohsin's insufficiency claim is not procedurally barred, then it should review the state court's decision reject-

reasonable argument that the prosecution failed to present evidence that could support a finding in its favor on each essential element of each charged offense; Sufian's testimony plainly sufficed in that regard, *see, e.g.,* TT 956–57 (describing how Mohsin stated his intent to kill Sufian before setting her on fire and locking her in the apartment), and her testimony was amply corroborated by circumstantial proof. Instead, Mohsin apparently relies on a theory that Sufian's testimony was incredible as a matter of law—or at least he did so when he actually submitted argument on the point in litigating the direct appeal of his conviction. *See* Direct Appeal, Memo. at 25–26. Such a theory is patently insufficient, and calls upon the court to usurp the jury's fact-finding role. *See, e.g., De-Chirico v. Walker,* 558 F.Supp.2d 355, 370 (E.D.N.Y.2008) (rejecting similar claim and citing cases). I therefore respectfully recommend that the court reject Mohsin's first claim.

### C. *The Admission Of Expert Testimony*

### 1. *The Claim Is Procedurally Barred*

▮ Mohsin's second claim for habeas relief is that he was denied due process of law when the trial court erroneously admitted Yurt's expert testimony. The only argument Mohsin has submitted in support of this claim is the assertion that Yurt was "unqualified to offer opinion evidence concerning the cause of [Sufian's] injuries

[and the] fire since he was a plastic surgeon not an expert in fires." DE 1 at 9.[9]

Mohsin did not fairly present this due process theory to the state courts in framing his objection to the admission of Yurt's testimony. Although Mohsin noted, in the section heading to the relevant section and at the conclusion of that section in his appellate brief, that the admission of the testimony violated his "right to a fair trial," he argued the point exclusively with reference to state law and did not present any arguments that his constitutional rights were violated. *See* Direct Appeal, Memo. at 32–43. All of the cases that Mohsin cited in his appellate brief were New York state court decisions construing state law. *See id.* at 38–41. The term "right to a fair trial" is not so particular to as to call to mind a specific right protected by the Constitution. *Daye,* 696 F.2d at 193 (2d Cir.1982) ("Obviously not every event in a criminal proceeding that might be described as 'unfair' would be a violation of the defendant's rights under the Constitution."). Nor is this an instance where the factual allegations supporting the claim are "well within the mainstream of due process adjudication," or where the courts of a state have previously treated a given fact pattern as appropriate for constitutional analysis. *Id.* at 193–94 (citing *Johnson v. Metz,* 609 F.2d 1052, 1057 (2d Cir.1979)). Accordingly, I respectfully

---

ing that claim *de novo* because its opinion arguably provided no explanation for the conclusion that the claim lacked merit (although it did properly invoke the applicable legal standard). *See Wiggins v. Smith,* 539 U.S. 510, 530–31, 535–36, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Boyette v. Lefevre,* 246 F.3d 76, 91 (2d Cir.2001). Regardless of whether the review is deferential or *de novo,* I conclude the court should reject the merits of Mohsin's insufficiency claim.

9. Citations to page numbers in Mohsin's Petition refer to the page numbers assigned by the docketing system to the 30–page document that Mohsin's counsel filed. The document contains a form habeas petition with pre-printed page number, but Mohsin's counsel has inserted unnumbered pages with additional information into that form. Thus, "DE 1 at 9" refers to "Page 9 of 30" as the document appears in the docket; the same page also bears the pre-printed number "Page 7" as part of the form that Mohsin's counsel completed.

recommend that the court find this claim to be procedurally barred.

### 2. *The Claim Lacks Merit*

Even if the court considers the merits of Mohsin's evidentiary claim, it should decline to order any relief.[10] This court "has a limited role to play, on habeas review, in assessing the merit of state evidentiary rulings, and may issue the writ only where the petitioner can show that erroneous rulings were of a constitutional magnitude." *Harry–Santiago v. Bennet,* 2001 WL 527474, at *1 (S.D.N.Y. May 16, 2001); *see Underwood v. Kelly,* 692 F.Supp. 146, 151 (E.D.N.Y.1988), *aff'd,* 875 F.2d 857 (2d Cir.1989). To prevail on this claim, Mohsin must show not only that the trial court erred in admitting Yurt's expert testimony, but also that the improper admission was "so prejudicial as to constitute fundamental unfairness"—meaning that the evidence was so material as to provide the basis for conviction or to remove a reasonable doubt that would have existed in the record without it. *Cunningham v. Bennett,* 2005 WL 1162475, at *5 (E.D.N.Y. May 16, 2005) (citation omitted). Mohsin can satisfy neither of those requirements.

First, the trial court did not err in admitting Yurt's testimony. At the time of the trial Yurt was the director of the Cornell Medical Center's Burn Unit, the largest burn unit in the country. TT 1187. The court considering Mohsin's direct appeal concluded that Yurt was "unquestionably ... qualified to give this testimony based on his cumulative and lengthy experience in treating burn patients." *Mohsin,* 755 N.Y.S.2d at 626. Mohsin provides no basis for disagreeing with that conclusion, and given the evidence that Yurt's testimony was based on extensive experience in treating burn victims who had disclosed the nature of the fires in which they were injured, *see* TT 1230–32, it appears to be correct.

Second, while Yurt's testimony was unquestionably material, Mohsin cannot demonstrate that any error in admitting it was so prejudicial as to deny him a fair trial. In addition to Yurt's testimony regarding the cause of Sufian's burns, the prosecution adduced testimony from several witnesses tending to show that the fire at issue was caused by the ignition of a flammable liquid. *See, e.g.,* TT 670; 728; 820. Moreover, former fire marshal West similarly opined—in testimony that Mohsin does not now challenge—that Sufian's injuries were consistent with having had gasoline poured on her. TT 1278. Accordingly, Mohsin cannot show that Yurt's testimony provided the basis for his conviction or that its omission would have created a reasonable doubt. I therefore respectfully recommend that the court reject this claim.

---

**10.** If the court finds that Mohsin's evidentiary claim is not procedurally barred, then its review of the merits should adhere to the deferential standard described above, requiring Mohsin to show that the state court's rejection of his claim was contrary to or an unreasonable application of clearly established federal law. As noted above, a federal court must review a procedurally viable habeas claim *de novo* if the challenged state court decision did not state any rationale for its result. *See Wiggins,* 539 U.S. at 530–31, 535–36, 123 S.Ct. 2527; *Boyette,* 246 F.3d at 91. The only way in which Mohsin's evidentiary claim is procedurally viable is if he can be considered to have fairly presented its federal constitutional component to the state court and if, in addition, the court did not rely on an independent and adequate state ground in rejecting the claim. If this court concludes that he did fairly present the claim, it must also conclude that the state court's explanation of the decision on the merits denying Mohsin relief on the claims relating to the admission of Yurt's testimony is entitled to deference. Even if the court were to review the decision *de novo,* however, I would recommend the same result.

D. *Allegations Of Witness Perjury And Suppression Of Exculpatory Evidence*

In his third claim, Mohsin asserts that he was denied due process because he was convicted on the basis of perjured testimony that the prosecutor knew to be false. In support of the claim, Mohsin points to multiple post-trial statements in which Sufian exonerated him—including one in which she claimed that the trial prosecutor threatened her with deportation if she exculpated Mohsin at trial—as well as a tape recording that Mohsin describes as an admission by Seerattan that he lied in his trial testimony. DE 1 at 12. In a related separate claim (the sixth in his petition), Mohsin claims that the prosecution improperly suppressed a recording of a 911 call that Mohsin asserts "contradicted material portions of [Seerattan's] trial testimony." *Id.* at 16. Mohsin address both claims of prosecutorial misconduct under a single point-heading in his brief in support of the instant petition, *see* Habeas Memo. at 72–88, and I will do likewise here.

1. *Sufian's Testimony*

■■■■ A prosecutor's knowing use of perjured testimony to secure a conviction violates the defendant's constitutional right to due process of law. *Hysler v. Florida,* 315 U.S. 411, 413, 62 S.Ct. 688, 86 L.Ed. 932 (1942). If Mohsin can demonstrate that the prosecutor knew or should have known that Sufian's testimony was perjured, he would need to show only a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Drake v. Portuondo,* 321 F.3d 338, 345 (2d Cir.2003) (internal quotation omitted). On the other hand, if the prosecutor did not have reason to believe that Sufian's testimony was false, the court could grant Mohsin relief only if it concluded that Sufi-

an's testimony was material and if it firmly believed that it is unlikely Mohsin would have been convicted in the absence of the perjury. *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991); *see Ortega v. Duncan,* 333 F.3d 102, 108 (2d Cir.2003).

■■■ Under either theory, of course, Mohsin must establish that Sufian's trial testimony was perjurious; if he cannot do so, he cannot establish a due process violation. *Palaguachi v. Keane,* 58 Fed.Appx. 862, 864 (2d Cir.2003) (citing *Sanders v. Sullivan,* 863 F.2d 218, 222 (2d Cir.1988)). In seeking to satisfy this requirement, Mohsin relies entirely upon Sufian's own efforts to recant her trial testimony—either in affidavits or in statements reported by others. Such recantation is viewed with the "utmost suspicion[.]" *Sanders,* 863 F.2d at 225 (2d Cir.1988). In order to determine whether her recantation is credible, the court must "weigh all the evidence of perjury before it, including but not limited to the recantation." *Ortega,* 333 F.3d at 107.

Moreover, in considering Mohsin's argument, the court is not writing on a blank slate. The state courts have repeatedly considered the proposition that Sufian's recantation of her trial testimony should result in a new trial. Even before he was sentenced, as part of his 330 Motion, Mohsin procured Sufian's recantation to Beg and proffered it in support of a motion for a new trial. It was in the latter proceeding that Mohsin asserted that the prosecutor coerced Sufian into giving false inculpating testimony. *See* 330 Motion, Counsel Aff. at 4, ¶ 5. The trial court declined to rely on Sufian's recantation and denied the motion without an evidentiary hearing; its decision in that regard was affirmed on appeal. *See* 330 Motion, Memorandum Decision at 2–3; *People v. Mohsin,* 302 A.D.2d 609, 755 N.Y.S.2d 625, 625 (2003).[11] Later, in his First 440

---

11. The trial court's decision was arguably based on an independent and adequate state

ground: in holding that Mohsin's evidence did not constitute "newly discovered evi-

Motion, Mohsin again claimed that Sufian had recanted and that he was therefore entitled to relief. In support of the latter motion, Mohsin submitted an affidavit from Sufian herself, in which she exonerated Mohsin, as well as affidavits from additional witnesses that tended to support certain details of the recantation. The court again denied the motion, holding that the recantation was inherently suspect, and it adhered to that conclusion on reconsideration. *See* First 440 Motion, Memorandum decision at 11; First 440 Motion, Reconsideration, Memorandum decision at 2. Those decisions were likewise affirmed when the appellate court rejected Mohsin's request for leave to appeal. Decision and Order dated October 11, 2000.

The state courts having twice rejected Mohsin's claims based on their assessment of the factual record, Mohsin bears a heavy burden in seeking collateral relief in this court. Specifically, he must show that the earlier denials of his motions rested on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Moreover, the decision that Sufian's recantation was itself false is "presumed to be correct" and Mohsin bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The case law of this circuit has not determined whether a habeas petitioner seeking relief from a state court decision that rested on a finding of fact must satisfy both of those statutory provisions—demonstrating *both* that the state court's factual determination was unreasonable in light of the evidence presented *and* that the evidence submitted

in support of the habeas petition clearly and convincingly rebuts the presumption of correctness that would otherwise attach to the state court's factual determination— or only one of them. *See Green v. Travis,* 414 F.3d 288, 298 n. 6 (2d Cir.2005) (citing *Channer v. Brooks,* 320 F.3d 188, 194 (2d Cir.2003) (per curiam)). I recommend that the court should assume without deciding that either showing would suffice, as I conclude that Mohsin cannot in any event satisfy either standard. *See id.* Specifically, Mohsin cannot show either that the state courts' determinations were unreasonable or that the additional evidence on which he now relies is sufficient to rebut the presumption that the state courts were correct to find Sufian's recantations incredible.

In considering whether Mohsin has met his burden in establishing his claim regarding Sufian's testimony, it is useful to bear in mind the evolution of her statements over time and the state of that development at the point each previous fact-finder has rendered a judgment. Briefly stated, each fact-finder has chosen to rely on Sufian's trial testimony as accurate—and to reject Mohsin's argument that it was false—despite knowing that Sufian had provided inconsistent accounts at other times.

Specifically, when the trial jury found Mohsin guilty, it knew that Sufian had initially absolved Mohsin of responsibility in repeated statements to investigators, and had only later changed her story and inculpated Mohsin—first in a revised statement to investigators, and then in her testimony at trial. The jury also heard that Sufian initially told investigators that

---

dence," it relied exclusively on state law. *See id.* at 2–3. However, the holding can also be read as a decision that Sufian's recantation was simply not credible enough to warrant relief, and the appellate court's decision affirming the denial of the 330 Motion did not

specify—as it did with respect to the insufficiency-of-the-evidence claim—that it was relying on state law in reaching its decision. Accordingly, I conclude that the state courts rejected on its merits Mohsin's claim that the prosecution knowingly relied on perjury.

the fire had been an accident that began while she was cooking, and that she had no knowledge about the gasoline container found in her apartment. *See* TT 699, 743.[12] It nevertheless chose to believe Sufian's trial testimony. The jury's decision was amply supported by other evidence, including the lack of damage to the kitchen stove and the nature of her injuries.

When the trial court, prior to sentencing, rejected Mohsin's 330 Motion, it had before it not only the trial record, but also Beg's affidavit reporting that Sufian had recanted. The latter affidavit makes clear that whatever else can be said about the evolution of Sufian's account over the years, her decision to implicate Mohsin with what she has at some times characterized as false testimony is not attributable to the trial prosecutor: Beg wrote that Sufian told him "that she lied in Court because [Mohsin] called the police on her [when she tried to see him at his office after being released from the hospital] and she was both angry and insulted, and was also pressured to take revenge on him by her family members[.]" 330 Motion, Beg Aff. ¶ 5. According to Beg, Sufian described the fire as an accident, and not the result of an intentional assault by Mohsin. *Id.* The court declined to rely on the recantation, as "inherently unreliable and insufficient alone to require setting aside a conviction" particularly in light of the fact that "the issue of 'inconsistent stories' given by [Sufian] was resolved by the jury at trial." 330 Motion, Memorandum Decision at 2, 3 (citing cases). Mohsin challenged that ruling on direct appeal, and his challenge was rejected at each level of review. *Mohsin,* 755 N.Y.S.2d at 625–26; *leave to appeal denied,* 100 N.Y.2d at 585, 764

N.Y.S.2d 395, 796 N.E.2d 487. The trial court's determination in that regard, and the decision by each higher court to uphold it, was eminently reasonable in light of the evidence. Moreover, far from rebutting the presumption of correctness, Mohsin's later submissions have only served to bolster it. For example, Beg's report that Sufian told him the fire was an accident is directly at odds with Mohsin's later submission of an affidavit in which Sufian swore that she intentionally set the fire to harm herself. *Compare* 330 Motion, Beg Aff. ¶ 5 *with* Second 440 Motion, Sufian Aff. (Sept. 12, 2005) ¶¶ 4–9.

Mohsin has similarly failed to establish that the denial of his First 440 Motion was unreasonable or to rebut the presumption that it was based on a correct finding that Sufian's recantation was not credible. In the latter motion, as he had done at trial and in his 330 Motion, Mohsin sought relief on the basis of an exculpatory statement by Sufian that was at odds with her inculpating testimony at trial. In this instance, he submitted an affidavit in which Sufian swore that she had purchased the gasoline container (about which she had disavowed knowledge in her initial attempt to exonerate Mohsin), that the lock on the apartment door was in good repair at the time of the fire, and that Mohsin broke through the locked door to rescue her once the fire had started. First 440 Motion, Sufian Aff. at 2. The court declined to rely on that affidavit in light of the inherently suspect nature of such recantation evidence as well as on the internal inconsistencies among the various accounts that Sufian had provided over time. First 440 Motion, Memorandum Decision at 11. It adhered to that view on Mohsin's motion

---

**12.** In addition to being inconsistent with her trial testimony, in which she inculpated Mohsin, the account that Sufian initially gave in trying to exculpate Mohsin is irreconcilable with her more recent efforts to achieve the same result. For example, the initial statement that she had no knowledge of the gasoline container is at odds with her post-trial assertion that she purchased the gasoline container herself. *Compare* TT 699 *with* First 440 Motion, Sufian Aff. at 2–3.

to re-argue the denial of relief. First 440 Motion, Reconsideration, Memorandum Decision at 2–3. The court's decision to reject Sufian's recantation was entirely reasonable in light of the multiple inconsistencies in the evolution of her statements and its insufficiency in refuting the prosecution's other evidence at trial.

Mohsin submitted still more affidavits from Sufian in connection with the Second 440 Motion. As part of his initial submission in support of that motion, Mohsin filed an affidavit in which Sufian for the first time explicitly stated not only that Mohsin was innocent, but that she had intentionally set herself on fire. Second 440 Motion, Sufian Aff. (Sept. 12, 2005) ¶¶ 4–9.[13] Mohsin supplemented Sufian's latest version of the incident with affidavits from purported experts who opined—based in part on talking to Sufian herself, as well as their review of the relevant records—that Sufian had intentionally started the fire in which she was injured. *See* Second 440 Motion, Rigle Aff. ¶¶ 3–8 & Abraham Aff. ¶¶ 11–15.

As a procedural matter, Mohsin's habeas petition does *not* raise any issue with respect to the state courts' view of the credibility of the latter submissions, because the Second 440 Motion did not seek a new trial on the basis of Sufian's alleged trial perjury. As a result, the issue before this court is whether the state courts' rejection of the perjury claim in the *First* 440 Mo-

tion retains its presumption of correctness in light of the evidence that Mohsin submitted in the course of litigating the *Second* 440 Motion. In other words, if the factual record were complete as of the end of the First 440 Motion, the claim of perjury that Mohsin now seeks to raise would have to be rejected on the ground that the court reasonably declined to rely on the affidavit that Sufian submitted in 2000 and because Mohsin would have no additional evidence with which to rebut the presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1).[14] As a result, Mohsin may secure relief on his claim that Sufian committed trial perjury only if the evidence submitted in support of the Second 440 Motion clearly and convincingly rebuts the presumption that the First 440 Motion was correctly decided. That it does not do.

In arguing that "Sufian's immediate and repeated recantations are reliable[,]" Habeas Memo. at 78, Mohsin ignores both the limited scope of this court's inquiry and the internal inconsistencies within those repeated recantations. Moreover, almost immediately after asserting, as the crux of his argument, that "Sufian stands to gain nothing by helping the petitioner[,]" *id.,* Mohsin notes that "[a]fter she lodged charges against the petitioner, Sufian placed calls to [him] and begged him to re-establish their relationship." *Id.* at 81. If Sufian does in fact have such a strong

---

**13.** Mohsin submitted a second affidavit by Sufian as part of his reply papers. In that affidavit, Sufian responded to one of the prosecution's arguments but added no new information about the fire or her trial testimony. *See* Second 440 Motion, Sufian Aff. (Nov. 5, 2005). Although the content of that last affidavit has no bearing on my analysis of the merits of Mohsin's claim, its convoluted assertions regarding just when Sufian allegedly lied is telling. The prosecution responded to Sufian's first 2005 affidavit by referring to statements made in the People's opposition to the 330 Motion, namely that Sufian had told them that Mohsin and his relatives had sought

to bribe her to support Mohsin's efforts to secure post-trial relief. Second 440 Motion, Counsel Aff. ¶ 6 n. 1; *see* 330 Motion, Counsel Aff. ¶ 13. Sufian's second 2005 affidavit sought to rebut that assertion not by denying that she had so informed the prosecutors, but by swearing that she had been lying when she gave them that information. Second 440 Motion, Sufian Aff. ¶ 4 (Nov. 5, 2005).

**14.** Mohsin did not submit any additional evidence supporting his claim that Sufian committed perjury at trial in the course of litigating the *Coram Nobis* Motion.

desire to resume a romantic relationship with Mohsin that she would beg him to do so, then it is hardly surprising that she would say whatever is needed to secure Mohsin's release from custody to make such a relationship possible. While Sufian's motivation to secure Mohsin's affections would explain the multiple inconsistencies within her several exculpatory statements—each designed to cure the shortcomings of the last—the proposition that she was lying at trial and telling the truth when she sought to exonerate Mohsin would not. The latter proposition would still raise troubling question of *which* of Sufian's exculpatory statements was true, and why she had bothered to make the ones that were false.[15]

Mohsin fares no better in seeking to bolster Sufian's latest recantations with the purportedly corroborating details of independent evidence, including the affidavits of the experts retained for purposes of the Second 440 Motion. *See* Habeas Memo. at 79–81. At most, such evidence would provide fodder for a jury argument if Mohsin were to secure a new trial.[16] But it does not constitute clear and convincing evidence sufficient to rebut the presumption of correctness that attaches to the state court decisions rejecting Sufian's recantations as incredible. As a result, I conclude that the court lacks authority to grant relief to Mohsin on the basis of his assertion that Sufian committed perjury at trial.[17] Moreover, even if

---

15. Similarly oblivious to the record is Mohsin's argument that "notwithstanding respondent's assertions, no proof has been submitted to any court that the defendant, his family and/or anyone else threatened Sufian or offered her a bribe." *Id.* at 78. In fact, the trial prosecutor submitted an affidavit in response to Mohsin's 330 Motion reporting that two interpreters employed by his office had been arrested and charged with attempting to tamper with Sufian's testimony by coercing her and offering inducements for her to change her story. 330 Motion, Counsel Aff. ¶ 10. The prosecutor further reported that Sufian had made a sworn, videotaped statement to him on June 8, 1999—prior to her first reported post-trial recantation—in which she stated that both Mohsin and his mother had attempted to induce her to change her story with promises of financial support and acceptance by Mohsin and his family. *Id.* ¶ 13.

16. Even viewed in that light, it does not seem at all likely that the evidence on which Mohsin now relies would have persuaded the jury that found him guilty to reach a different verdict. That jury heard about the conflicting statements Sufian had made about the fire's origin—from investigators and Sufian herself, *see* TT 698–99; 1085–93. Given that the experts on whom Mohsin now relies base their opinions in part on Sufian's latest exculpatory account of the fire (in which she claims to have intentionally set herself on fire), *see* Sec-

ond 440 Motion, Rigle Aff., ¶ 3(L); Second 440 Motion, Abraham Aff., ¶ 14(d), it is hardly obvious that such opinions, which contradict both Sufian's inculpatory trial testimony and the exculpatory statement about an accidental fire that she initially provided to investigators, would have swayed the trial jury's analysis of the evidence.

17. To the extent that Mohsin seeks to rely on the proposition that the prosecution knowingly relied on Sufian's perjured testimony, I respectfully recommend that the court reject his claim for two reasons. First, as set forth above, Mohsin has failed to establish the predicate proposition that Sufian's trial testimony was false—let alone that the prosecutor knew it to be so. Second, even taking Mohsin's many submissions at face value, and even assuming for purposes of analysis that Sufian's trial testimony was perjurious, there is no reason to ascribe instigation of the perjury or even contemporaneous knowledge of it to the trial prosecutor. Sufian has repeatedly stated in her post-trial submissions that she independently decided to inculpate Mohsin for reasons of her own. Moreover, she has never asserted that the prosecutor told her to say anything untrue or knew that she had done so. The closest Sufian comes to any such accusation is an assertion that the prosecutor, prior to trial, "instructed [her] on how to describe the fire" and then "[a]fter the trial, when [she] told him that she had lied at

the matter were before the court in the first instance, I would conclude that the all of the evidence supporting Mohsin's claim would not warrant treating Sufian's recantation with anything other than the "utmost suspicion[,]" *Sanders v. Sullivan,* 863 F.2d 218, 225 (2d Cir.1988), and would therefore recommend against granting Mohsin any relief on the basis of his claim that Sufian's trial testimony was perjured.

### 2. *Seerattan's Testimony*

■ The second prong of Mohsin's perjury-based claim is that he was denied a fair trial by the prosecutor's reliance on perjured testimony by Seerattan, the landlord from whom Mohsin rented the apartment in which the fire occurred. In particular, Mohsin assails as perjurious the portions of Seerattan's testimony in which he described the condition of the chain lock on the apartment's door, and also his description of two "Hispanic" or "Puerto Rican" strangers who pulled Sufian from the burning apartment. *See* Habeas Memo. at 81–88.

Mohsin is not entitled to any relief on this portion of his claim. As an initial matter, neither factual issue is of much significance, despite Mohsin's breathless arguments to the contrary. The condition of the chain lock on the apartment door is entirely inconsequential: regardless of whether the *chain* lock (which presumably could only be locked from the inside) was functioning at the time of the fire, it appears to be beyond dispute that the *key-*operated lock on the apartment door was functioning and that Sufian was locked inside. At trial, Sufian testified that Mohsin set her on fire and locked her inside— something that he could presumably accomplish only by locking the key-operated lock from the outside. In her latest post-trial recantation, Sufian swore that just before she poured gasoline over herself, she "locked the door and latched the chain lock." Second 440 Motion, Sufian Aff. (Sept. 12, 2005) ¶ 7. Either way, the door was locked, Sufian was left alone behind it to burn, and *any* rescuer—Mohsin, or the two men Seerattan described at trial— would have had to break in through a locked door.[18]

---

trial . . . told [her] that if [she] now told the truth, [she] could be put in jail and deported to Bangladesh." Second 440 Motion, Sufian Aff. (Sept. 12, 2005) ¶ 11. Even taken at face value—and neither the history of Sufian's statements in this case nor Mohsin's manifest willingness to distort the record when expedient suggests any reason for the court to do so—the statement makes clear that Sufian only alerted the prosecutor to her alleged perjury after the trial was completed. In light of that portion of her statement, there is no reason to view the allegation that the prosecutor "instructed [Sufian] on how to describe the fire" as anything other than a lay witness's description of the normal and acceptable practice of witness preparation in which counsel helps a witness to communicate more clearly the facts that the witness herself relates. Moreover, to the extent that Mohsin's claim is predicated on an assertion that the prosecutor steered Sufian's direct testimony at trial away from the subject of the condition of the apartment door lock, *see* Habeas Memo. at 75, First 440 Motion, Sufian Aff.

(Jan. 6, 2000) ¶ 11, he cannot prevail on a theory that the prosecutor knowingly relied on perjury. To the contrary, the latter aspect of Mohsin's theory rests on evidence that the prosecutor did *not* elicit, and ignores the fact that Mohsin was plainly in a position, in the exercise of due diligence, to gather evidence to support his theory if such evidence existed.

18. Mohsin asserts that there was no damage to the key-operated lock and that the two men Seerattan described at trial would have had to force it open to rescue Sufian from the blaze. Habeas Memo. at 83. As far as I can tell, the only witness from whose testimony the jury could infer the condition of that lock was Sufian, who testified (in a passage that Mohsin condemns as perjurious when he is not implicitly relying on it) that Mohsin locked her inside the apartment after starting the fire. *See* TT 956. To the extent the jurors credited that testimony, Mohsin was plainly in a position at trial to argue that they should therefore disbelieve Seerattan's testimony that two strangers had somehow managed to open

Similarly, whether Seerattan actually saw two "Hispanic" or "Puerto Rican" men helping Sufian out of the burning building, as he testified at trial, TT 504–05, 560–61, or whether he invented that testimony out of whole cloth as Mohsin now argues, Habeas Memo. at 82, is an issue that matters in this context only to the extent the answer would shed light on whether Mohsin was Sufian's assailant or her savior. Sufian herself cast Mohsin in the former role, and her testimony in that regard was supported by investigators who observed that Mohsin did not appear to have been in a fire. *See* TT 479, 1119–20. To the extent that Mohsin argues that "Seerattan's account provided crucial corroboration for Sufian" at trial, Habeas Memo. at 88, I disagree: Seerattan's testimony that Mohsin did not assist in the rescue was no more important than independent testimony about his appearance in the fire's aftermath that made it unlikely that his account of kicking in the door and rescuing Sufian was true.

Moreover, even if the condition of the lock, or Seerattan's description of Sufian's rescuers, was a critical fact in dispute, Mohsin's evidence would not suffice to demonstrate that Seerattan committed perjury on either score. That evidence consists of one of Sufian's several inconsistent post-trial recantations (including her report that Seerattan admitted his perjury in a tape-recorded conversation that Mohsin appears never to have submitted, as far as I can discern from the record), and a report by Mohsin's investigator of a state-

ment made by Seerattan's son that he had at some unspecified time before the fire fixed the lock (which in any event was not factually inconsistent with Seerattan's trial testimony). When Mohsin presented that evidence to the state court in support of the First 440 motion, the court properly refused to rely on it on the ground that Mohsin could have adduced the evidence at his trial in the exercise of due diligence and that it therefore did not qualify as newly discovered evidence. That decision under state procedural law was an independent and adequate basis for the court's decision and cannot be questioned on habeas review.

Finally, even if Mohsin could show that Seerattan's testimony was false, he has presented no evidence to establish that the prosecutor knew it to be so. As a result, the court may only grant relief on this portion of Mohsin's claim if the challenged testimony was material and if the court finds that it is unlikely Mohsin would have been convicted in its absence. *See Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir.2003); *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991). Because I conclude that Mohsin cannot make such a showing, I respectfully recommend that the court reject the third claim in his petition.

### 3. *The 911 Call*

■ Mohsin's sixth claim is related to his contention that Seerattan's testimony was perjured. Seerattan testified that on the morning of the fire, after hearing screaming from his driveway, he directed

---

the apartment door and rescue Sufian. Any discrepancy between Sufian's testimony and Seerattan's on that score was plainly before the trial jurors, and just as plainly did not dissuade them from finding that Mohsin was guilty beyond a reasonable doubt. While Mohsin's observation about the key-operated lock thus does nothing to advance his argument with respect to Seerattan's testimony, it does shed some light on the claim relating to

Sufian's testimony. If the condition of the key-operated lock casts doubt on Seerattan's trial testimony, it just as strongly subverts Sufian's 2005 affidavit to the effect that *she* both "locked the door and latched the chain lock." Second 440 Motion, Sufian Aff. (Sept. 12, 2005) ¶ 7. Accordingly, Mohsin's argument as to Seerattan serves only to weaken his argument that the court should rely on Sufian's recantation to grant habeas relief.

**308**

his wife to call 911 and went to investigate. TT 502. Mohsin now claims that testimony was false, and in doing so he relies on a recording of an unidentified person's call to 911. Based on the fact that the 911 operator addressed the caller as "sir" and confirmed the caller's telephone number as the one for the telephone in Seerattan's apartment, Mohsin contends that the caller was Seerattan himself. *See* Habeas Memo. at 86–87. The caller reported "a fire in the basement there in the house" and answered "yeah" when asked if "anyone [was] hurt or trapped in the fire[.]" Habeas Memo. at 85; *see id.* at 85–86 (reproducing transcript of call). Mohsin claims the call not only shows that Seerattan's testimony was false, but that the prosecution committed a *Brady* violation by failing to disclose the call before trial. *See* Habeas Memo. at 83–88; *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[19]

■■■ "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. The respondent argues that the prosecutor had no obligation to produce the 911 call because it was made to the fire department rather than to the police—a factual premise that Mohsin disputes. *See* Opp. at 146; Second 440 Motion, Counsel Supp. Aff. (Mar. 27, 2006) Ex. 12. For purposes of analysis, I will assume that the prosecution's *Brady* obligation with respect to the 911 call did not depend on the identity of the agency that actually received and recorded it.

■■■ A *Brady* violation occurs only where the evidence suppressed " 'could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *United States v. Coppa,* 267 F.3d 132, 139 (2d Cir.2001) (quoting *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citations omitted)). Viewed against this standard, Mohsin's claim must fail: the tape of the 911 call was not so critical that the prosecutor's failure to disclose it undermines confidence in the verdict. Mohsin assumes the caller was Seerattan and, from that, extrapolates that Seerattan could not possibly have witnessed Sufian's rescue from the fire because emergency workers placed a call some ninety seconds later indicating that no one was trapped in the apartment. Habeas Memo. at 87. Even if Seerattan was the caller, that fact would not undermine his testimony: he recounted at trial that he told his wife to call 911, but did not say whether she or someone else actually did so, nor was he asked whether he also made such a call. Further, assuming Seerattan was the caller, there is no inconsistency between that fact and the facts to which Seerattan testified at trial, and Mohsin has not demonstrated that it would have been impossible for Seerattan to both make the 911 call and witness the events he described. In addition, it is entirely possible that the unidentified male caller could have been Seerattan's son—Seerattan did not say that his wife made the call, only that he had asked his wife to do so. TT 502.

---

19. This claim is arguably unexhausted. Although Mohsin previously raised this claim in his Second 440 Motion, he did so only in a belated addition filed some six months after the motion was originally filed. *See* Second 440 Motion, Counsel Supp. Aff. (Mar. 27, 2006). Neither the state trial nor the state appellate court addressed the merits of this claim. Although the court could therefore decline to address the merits of the claim on that ground, I respectfully recommend that the court instead address the merits pursuant to 28 U.S.C. § 2254(b)(2) and reject the claim for the reasons set forth below.

Thus, a prosecutor who knew that a male caller in Seerattan's home had called 911 would have had no reason to conclude that such information was inconsistent with Seerattan's testimony and therefore favorable to the accused, and therefore would have had no obligation to disclose the call without a specific request. More to the point, the identity of the caller is an entirely collateral issue; there is simply no reason to believe that placing the call before the jury would have had any effect on the trial's outcome. I therefore respectfully recommend that the court reject Mohsin's *Brady* claim.

## E. *Ineffective Assistance of Counsel*

In the remaining two claims of his petition, Mohsin claims that he was deprived of his Sixth Amendment right to the effective assistance of counsel, both at his trial (the fifth claim in the petition) and on direct appeal of his conviction (the fourth claim). A defendant claiming ineffective assistance of counsel must both demonstrate that his counsel's performance "fell below an objective standard of reasonableness" in light of "prevailing professional norms" and "affirmatively prove prejudice" arising out of counsel's allegedly deficient representation. *Strickland v. Washington,* 466 U.S. 668, 688, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In reviewing Mohsin's claim, the court must make "every effort ... to eliminate the distorting effects of hindsight" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. 2052 (internal citations and quotation marks omitted). The central question is whether the adversarial process was so undermined by counsel's conduct that the trial cannot be relied on as having produced a fair result. *United States v. Gaskin,* 364 F.3d 438, 468 (2d Cir.2004) (citing *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052).

### 1. *Trial Counsel*

Mohsin claims that he was deprived of the effective assistance of trial counsel in five ways. Specifically, he faults his trial counsel for failing to call exculpatory fact witnesses, failing to offer exculpatory exhibits (in the form of recordings of Sufian purporting to exculpate Mohsin), failing to present expert evidence, failing to provide appropriate advice regarding the opportunity to seek a mistrial, and failing to call Mohsin to testify in his own defense. *See* Petition at 15; Habeas Memo. at 40–72.[20]

To the extent that Mohsin's claims may raise a factual question as to whether a challenged act or omission by trial counsel was the result of a strategic decision or was instead a matter of ignorance of the relevant facts or law, the court can and should conduct an evidentiary hearing. Such a proceeding provides an opportunity for counsel to explain the challenged aspects of his performance. *See Sparman v. Edwards,* 154 F.3d 51, 52 (2d Cir.1998) (per curiam) ("a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs"). I did not convene a *Sparman* hearing in this case, however, for two reasons. First, Mohsin's trial counsel have already had an opportunity to explain themselves by submitting affidavits in connection with the Second 440 Motion, in which Mohsin first raised his claim of ineffective assistance. Second,

---

**20.** Mohsin did not include the complaint about his trial counsel's failure to offer the recordings of Sufian in the petition itself, but did explicitly address the issue in his memorandum of law. *See* Habeas Memo. at 44–48.

I conclude that Mohsin cannot satisfy the second prong of the *Strickland* test with respect to any of his complaints about counsel's performance. Absent any such persuasive showing of prejudice, an assessment of counsel's performance becomes moot.

### a. *Fact Witnesses*

■■■ Mohsin called no witnesses in his defense at trial. He now argues that his counsel acted unreasonably in failing to call three fact witnesses: his brothers, Mohammed Rashid ("Rashid") and Akm Hoq ("Hoq"), and a friend named Saifullah Bhuiya ("Bhuiya"). Based on affidavits that Mohsin submitted in support of his Second 440 Motion, Mohsin claims that his brothers would have testified that Sufian called their home on several occasions looking for him and that Sufian once told Rashid that she would "drop all charges" if Mohsin would marry her. Habeas Memo. at 57; *see* Second 440 Motion, Rashid Aff. & Hoq Aff. Mohsin avers that Bhuiya would have testified that Sufian told him that the fire was accidental, that Mohsin saved her life, and that she inculpated Mohsin in her statements to the police in order to retaliate against him for the way he treated her. *See* Habeas Memo. at 57; Second 440 Motion, Bhuiya Aff. The state court that first considered Mohsin's argument on this issue rejected it on the ground that Mohsin's brothers were inherently biased and that Bhuiya had previously made materially different statements to Mohsin's attorneys. Second 440 Motion, Memorandum Decision at 5.

The decision about whether to call a particular witness—or any witness at all, save for the defendant himself—is a tactical decision committed to the sound professional judgment of trial counsel. *United States v. DeJesus*, 57 Fed.Appx. 474, 478 (2d Cir.2003); *see Carvajal v. Artus*, 2008 WL 4555531, at *37 & n. 34 (S.D.N.Y. Oct. 10, 2008) (collecting cases). Where

supported by valid tactical considerations, the failure to call a particular witness does not constitute ineffective assistance of counsel. *Rodriguez v. Mitchell*, 1993 WL 229013, at *5 (S.D.N.Y. June 24, 1993).

It was not objectively unreasonable for Mohsin's attorneys to forego calling his brothers or Bhuiya as witnesses, as they would have made little substantial contribution to the defense. The testimony of Mohsin's brothers could have been viewed with skepticism by the jury, who could well have concluded that they were overly interested in the case's outcome. *See James v. United States*, 2002 WL 1023146, at *15 (S.D.N.Y. May 20, 2002) (counsel's decision not to call witness was supported by the fact that the witness was the defendant's brother and would have been subject to impeachment for bias). Even more unassailable is trial counsel's decision not to call Bhuiya, as his testimony would likely have harmed Mohsin more than it helped once it was revealed that he had previously sworn that he had never spoken with Sufian about the fire. *See* Second 440 Motion, Opp., Singer Aff. ¶ 14 & Attachment (Bhuiya Statement). Mohsin cannot establish that his counsel's decision not to call any of these fact witnesses constituted deficient performance.

■■■ Mohsin also fails to show any prejudice arising from counsel's decision. None of the witnesses directly exculpated Mohsin; at most, they provided additional fodder for challenging Sufian's credibility. There is no reason to think that such cumulative testimony would have affected the trial's outcome: the many inconsistencies in Sufian's accounts of the fire were plainly before the jury, and Mohsin's counsel vigorously challenged her credibility on that basis. *See, e.g.,* TT 1054; 1086–93.

Mohsin's counsel did not fail to provide effective assistance in deciding against calling the three fact witnesses at issue, and their decision could not in any event

have prejudiced Mohsin enough to warrant habeas relief. *See Skinner v. Duncan,* 2003 WL 21386032, at *38 (S.D.N.Y. June 17, 2003) ("The failure to call cumulative or repetitive witnesses is neither ineffective nor prejudicial."). I therefore respectfully recommend that the court reject this portion of Mohsin's claim.

b. *Recordings Of Sufian's Statements*

■ Mohsin next complains about his trial counsel's failure to use as evidence a recording of conversations in which Sufian allegedly exonerated Mohsin. *See* Habeas Memo. at 44–48; Second 440 Motion, Mohsin's Counsel Aff. Ex. 3 (transcripts of recordings). In opposition to the corresponding portion of Mohsin's Second 440 Motion, the prosecution asserted that it had been prepared, in connection with pretrial litigation, to present the analysis of an expert who had concluded that the recording had been altered. Second 440 Motion, Counsel Aff. ¶ 28, Memo. 48–49; *see also* 330 Motion, Counsel Aff. ¶ 11. In addition, the prosecution submitted an affidavit by Mohsin's trial counsel, who explained that he had thought the recording would reflect poorly on Mohsin, who was "clearly badgering a very disconsolate and desperate woman who was willing to do or say anything to rekindle their relationship." Second 440 Motion, Singer Aff. ¶ 11. Applying *Strickland,* the state court ruled that Mohsin's counsel made "a reasonable trial decision, particularly as the lengthy and ambiguous conversations do not contain the clear confession alleged by the defendant, and are clearly manipulated by him." Second 440 Motion, Memorandum Decision at 6.

■ The state court's analysis was plainly correct, and I urge this court to endorse it. Moreover, trial counsel's sound reasoning in deciding against offering the recording also shows why Mohsin cannot have been prejudiced by that decision. The transcripts of the conversations unquestionably portray Mohsin as a manipulator taking advantage of Sufian's desperate desire to continue their relationship and could have severely prejudiced Mohsin before the jury—not only in the many passages in which he mercilessly badgers her, but also in the portion in which Mohsin threatens to kill Sufian if she "say[s] anything about [his] family." Second 440 Motion, Mohsin's Counsel Aff. Ex. 3 (transcripts of recordings) at 30. And while there are brief segments of the conversations from which Mohsin could have fashioned a strained argument that Sufian was exonerating him, those segments are not nearly sufficient to allow this court to second-guess the professional judgment of counsel that the recorded conversations would likely have done Mohsin more harm than good.

Trial counsel's decision not to introduce the recording, far from being unreasonable or prejudicial, was eminently sound and almost certainly served their client's best interest. I therefore respectfully recommend that the court reject this portion of Mohsin's ineffectiveness claim. *Lopez v. Rivera,* 157 Fed.Appx. 358, 359–60 (2d Cir. 2005) (affirming denial of habeas petition where "counsel's failure to introduce the two purportedly exculpatory documents was neither objectively unreasonable, as such failure was likely strategic, nor prejudicial, as the documentary evidence lends questionable support to petitioner's case").

c. *Expert Witnesses*

■ Mohsin next complains that his trial counsel failed to call an expert to refute the testimony of the two expert witnesses, West and Yurt, whose opinions about the cause of the fire and of Sufian's injuries bolstered the prosecution's theory of the case. Habeas Memo. at 48–57. Mohsin's counsel did consult with a plastic surgeon named Dr. Roger Simpson ("Simpson") and planned to call him as a witness at trial, but ultimately decided not

to do so on the ground that it "would not be favorable to the defendant." Second 440 Motion, Singer Aff. ¶ 16; *see also* TT 1308–09 & 1324 (indicating that trial counsel planned to call Simpson and another witness, and subsequently indicating that the defense planned to rest without calling witnesses); Second 440 Motion, Mohsin Aff. ¶¶ 14–15 (recalling that trial counsel consulted potential rebuttal expert); Second 440 Motion, Rashid Aff. ¶¶ 14–15 (same); Second 440 Motion, Ahmed Aff. ¶¶ 5–6 (same). Mohsin contends that his trial counsel should instead have consulted and presented the opinion of a forensic burn expert. *See* Habeas Memo. at 49 n. 11. In litigating his Second 440 Motion, Mohsin presented affidavits from two purported experts in that area: Dr. David Rigle ("Rigle") and Dr. Carl Abraham ("Abraham"). As the state court noted in rejecting Mohsin's argument, these purported experts would have opined, "in substance, that the complainant set herself on fire[.]" Second 440 Motion, Memorandum Decision at 7. The court ruled that Mohsin's post-trial discovery of witnesses willing to provide such opinions did not support the claim of ineffective assistance of trial counsel; as the court reasoned, counsel's "decisions regarding the use or non-use of expert witnesses were 'tactical decisions based not only upon the strengths and weaknesses of the entire case, but also upon the perceived impact/value of their proffered opinions.'" *Id.* (citing *People v. Toellner*, 299 A.D.2d 567, 750 N.Y.S.2d 646 (2002)).

I agree. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. "The decision to call an expert witness is a strategic decision for the defense counsel, and generally should not be disturbed." *Mazique v. Ercole*, 2008 WL 2884370, at *9 (E.D.N.Y. July 23, 2008) (citing *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)). Here, the state court concluded that Mohsin's attorneys investigated potential experts and determined that the testimony of the experts that they had consulted would not be beneficial to the defense. This court may not rely on later developments, such as the fact that Mohsin eventually located two witnesses willing to provide opinions that support Sufian's latest version of events (*i.e.*, that the she poured gasoline on herself, rather than the false story about an accidental cooking fire she originally gave to investigators) as a basis for questioning trial counsel's sound tactical decisions. *See Coleman v. Squilliante*, 2008 WL 4452351, at *13 (S.D.N.Y. Oct. 2, 2008) (citing *McKee v. United States*, 167 F.3d 103, 106 (2d Cir.1999)).

 Mohsin's argument also fails because he cannot establish prejudice. He has provided no basis for concluding that trial counsel would have found witnesses with opinions comparable to those later provided by Rigle and Abraham had he sought them out at the time of trial, nor has he demonstrated that any such witness would have been qualified to render such an opinion—indeed, it is hardly apparent that Rigle or Abraham themselves would have been found to have such qualifications.[21] Further, there is no reason to

---

**21.** Rigle's extensive curriculum vitae reveals that he is a licensed physician and board certified forensic examiner who specializes in medicine, pathology, and toxicology; it does not, however, disclose any experience concerning the causation and treatment of burns or the causation of fires. *See* Second 440 Motion, Rigle Aff., Attachment. It is there-

fore far from obvious that he would have been permitted to opine that Sufian's injuries were the result of a flash fire. Abraham does report having "investigated and consulted on several hundred cases involving flammable fabrics, burn injuries related to solvents, including gasoline[,]" Second 440 Motion,

believe that even if such opinions had been placed before the jury, there would have been a different verdict. "[A]n affidavit from one expert does not prove that every expert would view the evidence with the same eyes, or draw the same exculpatory conclusions." *United States v. Weinlein,* 234 F.3d 1263, *3 (2d Cir.2000) (unpublished table decision).

At a more fundamental level, however, opinions such as those proffered by Rigle and Abraham simply would not have undermined the prosecution's case. Both men opined—based in part on Sufian's latest account of the events at issue—that Sufian was injured in a "flash-fire" that she set herself and ignited at her feet. *See* Habeas Memo. at 49–51. Had such testimony been presented at trial, it would have done nothing to support the exculpatory story that Sufian had previously provided—namely, that she was injured in a cooking accident that took place at the kitchen stove. *See* TT 698–99. Expert testimony to the effect that the fire was intentionally set would have hardly helped Mohsin at trial, because the prosecution was the only party at that time seeking to persuade the jury that the fire was intentional.

#### d. *Mistrial*

■ Mohsin next faults his trial counsel for deciding not to ask for a mistrial when it appeared that the court was inclined to grant such relief. Mohsin's argument in this regard is undermined by the fact that he stated on the record at trial he did not want such relief, and preferred instead to see the case through to a verdict.

At three points during the trial, the court indicated that it might well grant a mistrial motion if Mohsin's counsel sought such relief. The first such instance occurred when Detective Piretti repeatedly volunteered information that was unresponsive to the prosecutor's questions on direct examination. After Mohsin's counsel repeatedly objected, the court instructed Piretti not to "volunteer anything." TT 870. Moments later, the prosecutor asked Piretti what she did after completing her initial interview of Sufian, during which the latter insisted that the fire was an accident. Piretti responded, "I took her hand and I gave her my card and I told her if she needed anything to give me a call. I informed her that the case would be marked closed." TT 871. Mohsin's counsel requested a sidebar, during which the court admonished the prosecutor for eliciting statements that were "superfluous and made to prejudice a jury." TT 872. During the sidebar, the trial judge twice stated that he would grant a motion for a mistrial if such a motion were made. *Id.*

The second instance arose during the testimony of social worker Joyce Scheimberg ("Scheimberg"). The court instructed the prosecutor to limit his direct examination by asking whether Scheimberg had met with certain individuals, and by eliciting a description of any physical observations she made upon meeting them. TT 1114. On cross-examination, Mohsin's counsel questioned Scheimberg about whether she took notes following her initial interview with Sufian and Mohsin at the hospital. Anticipating that the prosecutor would seek on re-direct examination to introduce those notes as a prior consistent statement, counsel asked the court to preclude him from so doing. The court granted the request and directed the prosecutor not to question Scheimberg about "what specifically is in the notes." TT 1136. Notwithstanding that order, the prosecutor proceeded to ask Scheimberg, "and you

Abraham Aff. ¶ 3, but there is no indication that he has ever been found qualified to provide opinion testimony in any case in any of his claimed areas of expertise.

indicate that the patient's eyebrows was [sic] singed, is that included in your notes?" TT 1137. Mohsin's attorney objected, and the court convened a sidebar conference at which it again indicated that it was amenable to a motion for a mistrial. TT 1137–38.

The court's solicitation of a mistrial motion apparently produced a dispute between Mohsin's two attorneys about how to proceed: attorney Schreiber moved for a mistrial, but attorney Singer appeared to disagree. TT 1138; *see also* Second 440 Motion, Schreiber Aff. at 2 (describing "a difference of opinion between counsel" as to the wisdom of seeking a mistrial). The court granted a recess during which Schreiber said he would discuss the matter with Mohsin and his family. When the recess ended, Schreiber withdrew the motion, indicating that the decision to do so was made after consultation with Mohsin and his family, and further stating that Mohsin had informed his attorneys that he wished to complete the trial and not have to go through another trial if that result could be avoided. Mohsin concurred with these statements on the record. TT 1139–40.

The third instance arose during the prosecutor's summation. Mohsin's counsel actually did move for a mistrial during the prosecutor's argument, TT 1433, but the court denied the motion. After the prosecutor concluded his argument, however, the judge asked whether counsel planned to make another motion for a mistrial and stated that he would "entertain it seriously." TT 1447. Counsel consulted with Mohsin and indicated that the defense intended to proceed to verdict. TT 1452. Mohsin confirmed on the record that he

wished to do so, and that the decision was made after consultation with his attorney. *Id.*

Mohsin argues that his trial counsel should have—but did not—advise him that the circumstances would have supported a motion for a mistrial with prejudice, which would have had the effect of barring a subsequent retrial, on the ground that the prosecutor had deliberately provoked a mistrial. *See* Habeas Memo. at 67–70 (citing *Davis v. Brown*, 87 N.Y.2d 626, 630, 641 N.Y.S.2d 819, 664 N.E.2d 884 (1996) (citing *Oregon v. Kennedy*, 456 U.S. 667, 673, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982))). In litigating the Second 440 Motion, Mohsin supported that claim with affidavits by himself and his brothers reporting that trial counsel did not discuss the possibility of limiting their motion to one for a mistrial with prejudice, and that they instead focused their discussion on the financial implications of a mistrial. *See* Second 440 Motion, Mohsin Aff. ¶¶ 30–35; *id.*, Rashid Aff. ¶¶ 17–24; *id.*, Ahmed Aff. ¶¶ 8–16. Both of the attorneys who served as trial counsel disputed those assertions. Second 440 Motion, Singer Aff. ¶ 17 & Schreiber Aff. at 2–3. In rejecting Mohsin's claim, the state court resolved that factual dispute and found that counsel "fully discussed the pros and cons of a mistrial" with Mohsin. Second 440 Motion, Memorandum Decision at 8.

In order for Mohsin to succeed on this part of his claim of ineffective assistance of counsel, he would at a minimum have to prove by clear and convincing evidence that the latter factual finding was wrong. *See* 28 U.S.C. § 2254(e)(1). Relying on the same factual record that was before the state court, and that the state court must be presumed to have interpreted correctly, Mohsin cannot succeed.[22] In addition,

---

**22.** Arguably, Mohsin would have to go further and also demonstrate that counsel's failure to discuss the possibility of limiting a mistrial motion to seeking a mistrial with prejudice was inherently unreasonable. For purposes

of analysis, I assume that the failure to discuss the matter would have been unreasonable. Thus, my conclusion that counsel did not provide deficient performance in this re-

even if counsel had moved for a mistrial with prejudice, there is no reason to believe that the court would have granted such relief—it had indicated only that it would consider a mistrial, not that it would consider granting the kind of relief that would ensure Mohsin could never be retried. Nor is there any reason to believe that the court would have had any basis to grant such relief: whatever the prosecutor's shortcomings in violating the court's directives, there is simply no basis to infer from the record that the prosecutor was deliberately seeking to provoke a mistrial. "[T]he mere fact that the Government's actions provide a defendant with the grounds for seeking and receiving a mistrial is insufficient for double-jeopardy protection to attach." *Magnotta v. Berry*, 906 F.Supp. 907, 914 (S.D.N.Y.1995) (citing *Kennedy*, 456 U.S. at 675–76, 102 S.Ct. 2083). Thus in the absence of any claim that counsel was ineffective for failing to secure a mistrial *without* prejudice—and Mohsin does not make such a claim—the court has no basis for granting this aspect of Mohsin's claim.

### e. *Mohsin's Failure To Testify*

 Mohsin also argues that his trial counsel's failure to call him as a witness deprived him of his right to testify in his own defense. In denying the Second 440 Motion, the state court held that "the decision that the defendant not testify was a legitimate, strategic one, and demonstrates neither ineffectiveness … nor an improper usurpation of the defendant's prerogative." Second 440 Motion, Memorandum Decision at 7. "The decision whether to testify belongs to the defendant and may not be made for him by defense counsel." *Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997). In order to prevail on this type of ineffectiveness claim, Mohsin must show both that his counsel acted unreasonably in re-

usurping the decision to testify, and that the effect was prejudicial. *Id.* at 79. I conclude that he has made neither showing.

Mohsin has not established that his attorneys prevented him from testifying. Although he has filed an affidavit swearing that they did so, such "blanket statements" without more are insufficient. *Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001). Moreover, Mohsin's trial counsel has submitted his own affidavit describing the "[s]erious and lengthy attempts" he and his co-counsel made in an effort to prepare Mohsin to testify. Second 440 Motion, Singer Aff. ¶ 19. The attorneys ultimately recommended against calling Mohsin because they concluded he would appear duplicitous and that his testimony would not be beneficial to the defense. *Id.* One of the attorneys explicitly denies Mohsin's allegation that he was not informed that the decision to testify was his, and he further notes that Mohsin's brother concurred in the decision that Mohsin should not testify. *Id.* In such circumstances, where a habeas petitioner's self-serving allegations are contradicted by a credible statement of trial counsel, the court may choose to discredit the petitioner's assertion without further hearing. *Castrillo v. Breslin*, 2005 WL 2792399, at *14 (S.D.N.Y. Oct. 26, 2005). I recommend that the court do so here and find that Mohsin's attorneys did not prevent him from testifying.

 The court should also reject this aspect of Mohsin's ineffectiveness claim because he suffered no prejudice. Mohsin's self-serving story was in any event placed before the jury when prosecution witnesses Eckert and Piretti recounted the statements he made during the investiga-

---

gard is based on the presumption of correctness that attaches to the state court's factual

finding that counsel did in fact discuss the matter with Mohsin.

tion. Specifically, the jury heard Mohsin's claim that after leaving the apartment and then returning to retrieve his beeper, he heard Sufian screaming, kicked the door open notwithstanding the chain lock that kept it closed, and rescued Sufian from the burning apartment. TT 740, 853. By adding his own live testimony at trial, Mohsin would have added no material exculpatory information but would have exposed himself to potentially damaging cross-examination.[23] Accordingly, Mohsin suffered no cognizable prejudice. *See Rega v. United States,* 263 F.3d 18, 22 (2d Cir.2001). I therefore respectfully recommend that the court reject this final portion of Mohsin's ineffectiveness claim as well.

### 2. *Appellate Counsel*

■ The fourth claim for relief that Mohsin included in his habeas petition is that he was denied the effective assistance of appellate counsel. Petition at 13. The entire argument that Mohsin has submitted in support of that claim is a handwritten notation in the petition itself that "Appellate Counsel unjustifiably failed to argue that Petitioner was entitled to a mistrial, with prejudice for prosecutorial misconduct." *Id.* Mohsin—who is represented by counsel in this proceeding—has included no argument on the claim in his 89–page memorandum of law.

When Mohsin raised the same claim in his *Coram Nobis* Motion, the state court ruled that he had "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Mohsin,* 16 A.D.3d 599, 790 N.Y.S.2d 881, 881 (2005) (citing *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *People v. Stultz,* 2 N.Y.3d 277, 778 N.Y.S.2d 431, 810 N.E.2d 883 (2004)). I conclude that its ruling was correct.

■ The Sixth Amendment does not guarantee a convicted defendant an appellate counsel who will brief and argue every non-frivolous claim that his client suggests; to the contrary, an important part of appellate counsel's role is to select the arguments most worth making on appeal and to abandon weak claims. *Jones,* 463 U.S. at 751, 752–53, 103 S.Ct. 3308. Reading any other standard into the Sixth Amendment "would disserve the ... goal of vigorous and effective advocacy[.]" *Id.* at 754, 103 S.Ct. 3308.

Mohsin has not shown that the omission of a prosecutorial misconduct claim on direct appeal was unreasonable. The record reveals that Mohsin's appellate counsel considered raising a claim of prosecutorial misconduct but decided against doing so because many of the objections he might otherwise have raised had not been preserved for appeal and because he believed that Mohsin would fare better by focusing his appellate arguments on the four issues included in his appellate brief. *Coram*

---

**23.** To the extent Mohsin argues that he would have provided the jury with information that Sufian had faked a suicide attempt months before the fire, such testimony would have been irrelevant to any issue before the jury except Sufian's general credibility, as to which it would have been cumulative. An attempt to explain away part of West's testimony by explaining he had less soot on his clothes than might be expected because he had only opened the door part of the way when he rescued Sufian would likely have backfired. Such testimony would have implicitly accepted West's methodology but would have disagreed with only part of his analysis, and even that disagreement would have rested on a factual assertion at odds with the first-hand observation of neutral witnesses. *See* TT 479, 1119–20. Finally, to the extent Mohsin claims he could have "independently authenticated" the recording of his conversations with Sufian, Habeas Memo. at 63, he is simply incorrect: the decision not to introduce that evidence was properly made by his counsel, and there is no reason to believe that counsel would (or should) have chosen to offer that evidence if Mohsin had testified.

*Nobis* Motion, Mischel Aff. ¶¶ 9–11. It is precisely that kind of exercise of professional judgment that marks the work of effective appellate counsel; such a decision cannot be characterized as unreasonable performance. *See Jones,* 463 U.S. at 751, 103 S.Ct. 3308.

Moreover, Mohsin's appellate counsel was correct to abandon the prosecutorial misconduct claims on the ground that they were generally not preserved for review. Although trial counsel did object to much of the prosecutor's conduct that Mohsin described as improper in his *Coram Nobis* Motion, in most instances he did not renew the objection after the court's curative instructions, as required for preservation under New York law. *See People v. Ruiz,* 301 A.D.2d 445, 752 N.Y.S.2d 881, 882 (2003) (finding that failure to object after the trial court entered a curative instruction rendered the objection unpreserved for appellate review). To the extent that any instances of alleged misconduct might have been preserved, Mohsin has failed to demonstrate to this court that any such misconduct would have warranted a reversal of his conviction. Accordingly, even if there were some basis for criticizing appellate counsel's performance, Mohsin has not established that counsel's failure to raise claims of prosecutorial misconduct resulted in any prejudice to Mohsin. I therefore respectfully recommend that the court reject Mohsin's claim that he was denied the effective assistance of appellate counsel. *See Garcia v. Graham,* 2008 WL 2949383, at *13 (E.D.N.Y. July 31, 2008) (rejecting ineffective assistance claim based on prosecutorial misconduct where many of the alleged instances of misconduct were unpreserved for appellate review).

### III. *Recommendation*

For the reasons set forth above, I respectfully recommend that the court deny Mohammed Mohsin's petition for a writ of habeas corpus.

### IV. *Objections*

This Report and Recommendation will today be filed electronically on the docket and is therefore deemed served on the parties as of today's date. Any objections to this Report and Recommendation must be filed no later than March 31, 2009. Failure to file objections within this period waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b)(2); *Beverly v. Walker,* 118 F.3d 900 (2d Cir.1997); *Savoie v. Merchants Bank,* 84 F.3d 52 (2d Cir.1996).

**SO ORDERED.**

Dated: Brooklyn, New York

March 17,2009